IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

| | | |
|---|---|---|
| NATIONWIDE MUTUAL INSURANCE COMPANY, | ) | |
| NATIONWIDE MUTUAL FIRE INSURANCE | ) | |
| COMPANY and NATIONWIDE PROPERTY & | ) | |
| CASUALTY INSURANCE COMPANY | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 4:10cv69 |
| | ) | |
| v. | ) | |
| | ) | |
| THE OVERLOOK, LLC, STEVEN A. MIDDLETON, | ) | |
| VISTA MIDDLETON, LLC | ) | |
| and | ) | |
| RICKY L. EDMONDS | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT RICKY L. EDMONDS' REPLY MEMORANDUM IN
RESPONSE TO DEFENDANT THE OVERLOOK, LLC'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

COMES NOW Defendant Ricky L. Edmonds, by counsel, and as in for his Response to Defendant The Overlook, LLC'S Motion for Partial Summary Judgment, and in support thereof sets forth the following.

## INTRODUCTION

Edmonds herein joins issue on The Overlook, LLC ("Overlook")'s Motion for Summary Judgment and by responding to Overlook's Motion for Partial Summary Judgment asks the Court to rule as a matter of law that Nationwide must defend Overlook in the matter of Edmonds v. Parallel Design & Development, LLC et al. The suit and its allegations speak for itself. It will be suggested that based upon the Certificate of Occupancy that Mr. Edmonds entered the premises on July 25, 2006. Nationwide issued to Overlook (the party defendant in the Edmonds

1

matter) a series of policies from May 1, 2004 through May 1, 2008, designated 53PR 140-682-3001. The so-called "pollution exclusion" language is identical in all.  It will be suggested below that these policies <u>by their terms</u> apply to this loss and provide coverage based upon the specific wording of the exclusion.  In addition, the allegations of the Complaint based upon Virginia's well settled Potentiality Rule set up myriad circumstances wherein coverage would have to be provided given a) that there are no allegations in the Complaint of defined "pollutants" in the context of the policy of insurance itself; b) the term "pollution" is ambiguous in and of itself as applied to the characteristics of a product used as a building material in a home; c) that it would therefore be unreasonable pursuant to well settled Virginia law to exclude coverage for such a circumstance and in light of well settled Virginia law requiring that such policy exclusions be "reasonable in scope;" and finally d) the exclusions are <u>inapplicable</u> given the wording of the exclusion.

After consideration of these matters, it is requested that the Court grant partial summary judgment to Overlook and Edmonds as an interested party joins in the summary judgment motion seeking partial judgment on the inapplicability of the exclusion which appears to be central to Nationwide's policy avoidance and apparent breach of contract.

## <u>STATEMENT OF UNDISPUTED FACTS</u>

1. From May 1, 2004 through May 1, 2008, Nationwide issued to Overlook four (4) policies of insurance designated 53PR 140-682-3001.

2. Edmonds occupied a dwelling constructed by Overlook on July 25, 2006.

3. Edmonds concurs with the other facts set forth by Overlook.

4. These policies contain the following identical language purporting to define the so-called

"pollution exclusion" (emphasis added):

**2. Exclusions**

   **f.    Pollution**

      **(1)    "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":**

        (a)    At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured. **However, this subparagraph does not apply to:**

          (i)    "Bodily injury" if sustained within a building and caused by smoke, fumes, vapor or soot from equipment used to heat that building;

          (ii)    "Bodily injury" or "property damage" for which you may be held liable, if you are a contractor and the owner or lessee of such premises, site or location has been added to your policy as an additional insured with respect to your ongoing operations performed for that additional insuraed at that premises, site or location and such premises, site or location is not and never was owned or occupied by, or rented or loaned to, any insured, other than that additional insured; or

          (iii)    "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire";

        (b)    At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;

        (c)    Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for:

          (i)    Any Insured; or

          (ii)    Any person or organization from whom you may be legally responsible; or

        (d)    At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection

with such operations by such Insured, contractor or subcontractor. **However, this subparagraph does not apply to:**

(i) "Bodily injury" or "property damage" arising out of the escape of fuels, lubricants or other operating fluids which are needed to perform the normal electrical, hydraulic or mechanical functions necessary for the operation of "mobile equipment" or its parts, if such fuels, lubricants or other operating fluids escape from a vehicle part designed to hold, store or receive them. This exception does not apply if the "bodily injury" or "property damage" arises out of the intentional discharge, dispersal or release of the fuels, lubricants or other operating fluids, or if such fuels, lubricants or other operating fluids are brought on or to the premises, site or location with the intent that they be discharged, dispersed or released as part of the operations being performed by such Insured, contractor or subcontractor;

(ii) **"Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor, or**

(iii) "Bodily injury" or "property damage" arising out of heat, smoke or fumes from a "hostile fire".

(e) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the operations are to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants".

**(2)** **Any loss, cost or expense arising out of any:**

(a) **Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants"; or**

(b) **Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of**

"pollutants".

However, this paragraph does not apply to liability for damages because of "property damage" that the insured would have in the absence of such request, demand, order or statutory or regulatory requirement, or such claim or "suit" by or on behalf of a governmental authority.

## ARGUMENT

"The principal purpose of insurance is protection and insurance policies are drafted by insurance companies, if the language of the policy of capable of different interpretations, we will construe it in favor of coverage or indemnity and against a limitation of coverage." <u>United Services Auto Assoc. v. Webb</u>, 235 Va. 655, 369 S.E.2d 196, 198 (1988).

I.   <u>Virginia law governing policy interpretation and the duty to defend and indemnify</u>

Long standing jurisprudence governs how to apply policy terms. Central to this law is the concept that any uncertainty resolves against the insurer (such as when different reasonable people can read the policy in more than one way) because the words are chosen by the insurer.

- In construing policies, courts look to the text. "Courts interpret insurance policies…in accordance with the intention of the parties gleaned from the words they have used in the document." <u>Seals v. Erie Ins. Exch.</u>, 277 Va. 558, 562, 674 S.E.2d 860, 862 (2009); <u>Floyd v. Northern Neck Ins. Co.</u>, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993).

- Virginia law resolves all ambiguities against the carrier. "Insurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders." <u>St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc.</u>, 277 Va. 407, 411, 316 S.E.2d 734, 736 (1984). "The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it." <u>Id.</u> at 411, 316 S.E.2d at 736; <u>Seals</u>, 277 Va. at 562, 674 S.E.2d at 862.

- "[A]n ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time." <u>Lincoln Nat. Life Ins. Co. v.</u>

Commonwealth Corrugated Container Corp., 229 Va. 132, 136-137, 327 S.E.2d 98, 101 (1985).

- An ambiguity also exists if two readings are reasonable.  So coverage exists if "…reasonable men…may reach reasonable, but opposite, conclusions…" Nusbaum, 227 Va. at 411, 316 S.E.2d at 736.

- "[W]hen an insurer seeks to limit coverage under a policy, the insurer must use language that is reasonable, clear, and unambiguous." Williams v. Virginia Farm Bureau Mut. Ins. Co., 278 Va. 75, 81, 677 S.E.2d 299, 302 (2010).

- Under Virginia law, language is considered to be ambiguous when it can be understood in more than one way or when such language refers to two or more things at one time.  Lincoln Nat. Life Ins. Co. v. Commonwealth Corrugated Container Corp., 229 Va. 132, 137, 327 S.E.2d 98, 101 (Va. 1985); Salzi v. Farm Bureau Mut. Ins. Co., 263 Va. 52, 55-56, 556 S.E.2d 758, 760 (Va. 2002).  In the face of such ambiguity, courts will interpret the policy language most strongly against the insurer and in favor of coverage.  Ambiguity is defined as "uncertainty or inexactness of meaning in language." See New Oxford American Dictionary (2nd ed.).


## II.  Duty to defend in Virginia

The duty to defend is controlled by the interpretation of the insurance policy.  The terms of the policy should be construed in light of their subject matter and the words "should be given their natural and ordinary meaning as understood in the business world." See London Guarantee & Acc. Co. v. C.B. White & Bros., 188 Va. 195 (1948).

In construing an insurance policy, the Virginia courts follow a combination of the Exclusive Pleading Rule and the Potentiality Rule.  See Solers, Inc. v. Hartford Mut. Ins. Co., 146 F. Supp. 2d 785 (E.D. Va. 2001).  The former provides that the duty to defend is determined solely by the claims asserted in the pleadings, and the latter provides that the duty to defend is triggered if there is any "potentiality" that the allegations could state a claim covered by the policy. Id. See also Brenner v. Lawyers Title Ins. Corp., 240 Va. 185, 397 S.E.2d 100 (1990).

An insurer is relieved of the duty to defend "only when it clearly appears from the initial pleading the insurer would not be liable under the policy contract for *any* judgment based upon the allegations." *See* Reisen v. Aetna Life and Casualty Co., 225 Va. 327, 302 S.E. 2d 529 (1983) (emphasis added). All insuring provisions are construed broadly and any ambiguity is construed liberally in favor of the insured, and strictly against the insurer. Solers, Inc., *supra.* at 789. The underlying Edmonds Complaint is replete with such allegations.

Insurance policies are contracts whose language is ordinarily selected by insurers rather than by policyholders. The courts, accordingly, have been consistent in construing the language of such policies, where there is doubt as to their meaning, in favor of that interpretation which grants coverage, rather than that which withholds it. Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer. *See* St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., 227 Va. 407, 411, 316 S.E.2d 734, 736 (1984) (emphasis added) citing Ayres v. Harleysville Mut. Cas. Co., 172 Va. 383, 2S.E.2d 303 (1939); Fidelity & Casualty Co. v. Chambers, 93 Va. 138, 24 S.E. 896 (1896); United States Mutual Accident Assn. v. Newman, 84 Va. 52, 3 S.E. 805 (1887). "Doubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it." Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234, 415 S.E.2d 131, 134, 8 Va. Law Rep. 2136 (1992).

While any ambiguity must be resolved against the insurer, the construction adopted should be reasonable, "and absurd results are to be avoided." Transit Casualty Co. v. Hartman's Inc., 218 Va. 703, 708, 239 S.E.2d 894, 896 (1978) (emphasis added).

**A.** **By their terms, each of the referenced policies covers the acts alleged in the Edmonds Complaint regardless of any underlying definition of "pollutant".**

In the referenced policies, the term "pollutants" means any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

Elsewhere in this brief, Edmonds argues that the unspecified compounds which are generated synergistically in the home do not meet such categorization or definition in that the general term "pollution" has an understanding that involves environmental or atmospheric events of a specific and definable nature. However, regardless of whatever the definition of pollutant is, it is apparent by use of an ISO standard form that Nationwide agrees that the release of fumes, vapors or gases within a building secondary to the placement of a building material specifically provides for coverage.

The referenced policy indicates that the exclusion does not apply to (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor..."

Not only does this provide specific credence to Edmonds' and Overlook's arguments that there cannot be "pollution" inside of a home or building, it is very clear that the insurer itself specifically provides coverage for losses claimed by Edmonds which by his Complaint only occurred within the home and secondary to a product brought into that home which he alleges is defective. These four (4) policies specifically provide coverage, and at worst create a framework of ambiguity in that there is clearly a distinction between the events involving gases, fumes or vapors occurring inside of the building as opposed to a traditional environmental event.

Flatly, the Court should hold that these policies are therefore applicable to the losses claimed by Edmonds not only based upon a duty to defend, but most specifically, a duty to indemnify.

**B.  Divergence of judicial opinion on the applicability of the policy exclusions suggests inherent ambiguities therein and are evidence of reasonable equally plausible meanings**

It is the concept of "reasonableness" as held by the Virginia Supreme Court explicitly for the first time in <u>Williams v. State Farm</u>, *supra*, that underscores the argument of Edmonds and similarly situated insureds herein. It is preeminently "unreasonable" to state that "pollution" and the environmental terms of art that modify the exclusion, such as "seepage," "discharge," "release," and "escape," are anything other than terms that relate to a traditional pollution event that affects the environment. It would be unreasonable to apply these terminologies which do not have "plain meaning" in the context of an in home loss secondary to the characteristics of a building material that synergistically creates unspecified compounds in unspecified amounts. One must only imagine the outcome of an informal focus group of individuals at any mall, sporting event, or other gathering who are asked the question of what they would consider to be "pollution" or a "pollutant." Undoubtedly, the vast majority of such individuals would refer to a traditional environmental event such as an oil spill, toxic or medical waste, smokestack emission, or anything else that affects the outside environment. [1]  It will be urged below that a significant number of cases resulting from the deliberations of the highest courts of individual states as well as United States District Courts, holding that it is reasonable as a matter of law to interpret such provisions solely in the context of traditional environmental pollution are specific, credible and cogent evidence of a reasonable policy interpretation on the part of Edmonds or any insured.

---

[1] The National Association of Home Builders certainly agrees with Edmonds' interpretation—see its Amicus Brief filed in <u>Travco Ins. Co. v. Ward</u>, No. 2:10cv14, 2010 U.S. Dist. LEXIS 54387 (E.D. Va. June 3, 2010).

Many courts have held that the mere "fact that there is a difference of judicial opinion with respect to the proper construction of given language found in policies of insurance is at least evidence of an ambiguity within the rule that ambiguous language should be construed most strongly against the insurer and most favorably to the insured."[2] *See* Charles C. Marvel, LL.B., "Division of opinion among judges on same court or among other courts or jurisdictions considering same question, as evidence that particular clause of insurance policy is ambiguous," 4 A.L.R.4[th] 1253, § 2[a] (originally published in 1981) (cases cited therein). *See, e.g.*, Stroehmann v. Mutual Life Ins. Co., 300 U.S. 435, 439 (1937); Minnesota Mut. Life Ins. Co. v. Marshall, 29 F.2d 977, 978 (8th Cir. 1928), *cert. denied*, 279 U.S. 851 (1929) (conflicting lines of judicial "decisions ... themselves establish doubt as to the construction and meaning of the provisions which we are called upon to interpret."); Bayersdorfer v. Massachusetts Protective Ass'n, 20 F. Supp. 489, 492 (S.D. Ohio 1937), *aff'd*, 105 F.2d 595 (6th Cir. 1939) ("where the courts are substantially in hopeless conflict, it cannot be said that the meaning is clear or unambiguous."); Travelers Indem. Co. v. Summit Corp. of America, 715 N.E.2d 926, 936 (Ind. Ct. App. 1999) ("A division between courts as to the meaning of the language in an insurance contract is evidence of ambiguity."); Security Ins. Co. of Hartford v. Investors Diversified, Ltd., 407 So. 2d 314, 316 (Fla. App. 4th Dist. 1981) (conflicting holdings between Fifth Circuit Court of Appeals and California Supreme Court regarding interpretation of identical language "offer[ed] as proof of that pudding" – that ambiguity exists); Cohen v. Erie Indem. Co., 432 A.2d 596, 599 (Pa. Super. 1981) (existence of conflicting opinions "creates the inescapable conclusion that the provision in issue is susceptible to more than one interpretation."); Zanfagna v.

---

[2] Edmonds is mindful of the Supreme Courts holding in Nationwide v. Wenger, 222 Va. 263, 278 S.E.2d 874 (1981) but submits that in the context of an ambiguous policy term, other Court's considerations of the undefined terms are persuasive given the "reasonableness" standard and the fact that in the pollution context, the complex nature of the inquiry demands examination of how the terms have been defined in various settings to properly determine contractual intent.  The current exclusions at issue also post-date Wenger.

Providence Washington Ins. Co., 415 A.2d 1049, 1051 (R.I. 1980) ("This diversity of judicial thought, in our opinion, is proof positive of the ambiguities found in the policy."); Allstate Ins. Co. v. Hartford Acc. & Indem. Co., 311 S.W. 41, 45 (Mo. App. 1958) (finding ambiguity with different courts' interpretations of the word "permission"); Alvis v. Mutual Ben. Health & Acc. Ass'n, 201 Tenn. 198, 204-05, 297 S.W.2d 643, 645-46 (1956) (conflicting decisions demonstrate ambiguity); George H. Olmsted & Co. v. Metropolitan Life Ins. Co., 118 Ohio St. 421, 427-28, 161 N.E. 276, 277-78 (1928) ("the fact that such respectable authority is in irreconcilable conflict, and was so long prior to the execution of the insurance contracts here under consideration, … presents such persuasive argument of the ambiguity of the clause"); *but see* Nationwide Mut. Ins. Co. v. Wenger, *supra* (refusing to "convert an otherwise unambiguous CGL policy into a performance bond" in favor of insured even though a number of jurisdictions interpreted relevant clause differently).

The reasoning employed to arrive at this conclusion is that "one cannot expect a mere layman to understand the meaning of a clause respecting the meaning of which fine judicial minds are at variance." 4 A.L.R.4[th] 1253, § 2[a].

That "pollutant" or "pollution" can be interpreted by reasonable persons in different ways is undeniable.  Compelling arguments have been made that since reasonable judges have come to differing judicial interpretations of the same policy language, this is arguably dispositive evidence of the existence of multiple "reasonable" interpretations, thereby mandating coverage pursuant to Virginia law and arguably the law of several jurisdictions.  *See* Virginia Farm Bureau v. Williams, 278 Va. 75, 81, 677 S.E.2d 299, 302 (2009).  If courts arrive at different interpretations of identical contract provisions, then it is hard to imagine how the provision could

be said to be unambiguous, or at the very least it would be "reasonable" to interpret the pollution exclusion clause in the fashion urged by Edmonds herein.

This was understood in <u>Fireman's Ins. Co. of Washington, D.C. v. Kline and Son Cement Repair</u>, 474 F. Supp. 2d 779 (E.D. Va. 2007)[3], there the court noted that in consideration of the terms "pollution" or "pollutant" coupled with the words "discharge, dispersal, seepage, migration, release or escape" – clearly environmental clean-up terms of art – there is an absolute split in Federal and State Courts:

> Jurisdictions are split as to the meaning of the terms "discharge, dispersal, seepage, migration, release or escape."
>
> These methods of travel requirements have been both narrowly and broadly construed by various jurisdictions, usually depending upon whether that jurisdiction views pollution as limited to traditional, industrial and environmental pollution or not. Lee R. Russ and Thomas F. Segalia, 9 *Couch on Insurance* 3d Section 127:9 at 127-28 (West 2005). Numerous courts have held that a pollution exclusion bars coverage for all injuries caused by the release of pollutants, even when the pollutant is dispersed into a confined or indoor area. *Id.* n.1. In contrast, other courts have held that the exclusion does not apply if the facts show that the discharge, dispersal, release or escape was a localized toxic accident occurring within the vicinity of the pollutant's intended use. *Id.* Section 127:9 at 127-128 to 127-29 n.2.

474 F. Supp. 2d at 794. <u>Cf. Roinestad v. Kirkpatrick</u>, 2010 WL 4008895, *5 (Colo. App. Oct. 14, 2010) ("insurer has failed to sustain its burden of demonstrating that the pollution exclusion applies due to the discharge of hydrogen sulfide"). The court found the exclusion applicable but also failed to consider the "reasonableness" standard and how such a split underscores a "reasonable" view of the terms "pollution", "seepage", "migration", "release" and "escape."

---

[3] It is respectfully submitted that the learned court might have ruled differently if individual counsel had urged the "reasonableness" standard critical to interpretation of insurance contracts in Virginia. Nowhere in the opinion is the standard directly analyzed-it would seem that the numerous high court decisions in agreement with the interpretive position of the insured would be strong evidence of a reasonable interpretation of ambiguous terms mandating coverage. This would particularly be true when a key term is as here undefined. It is submitted that the decision of the Virginia Supreme Court in <u>Williams</u>, *supra*, changed this equation in favor of ambiguity.

The various dictionary definitions of "pollution" include the following:

1. The act of polluting or the state of being polluted. *Available at http://dictionary.reference.com/browse/pollution.*
2. The introduction of harmful substances or products into the environment: *air pollution. Id.*
3. Harmful or poisonous substances introduced into an environment. <u>World English Dictionary</u> *available at http://dictionary.reference.com/browse/pollution.*
4. Sense of "contamination of the environment" first recorded c.1860, but not common until c.1955. Pollute (v.) is attested from c.1380 in sense "defile" from L. pollutes, pp. of polluere. Meaning "contaminate the environment" first recorded 1954. <u>Online Etymology Dictionary</u>, *available at http://dictionary.reference.com/browse/pollution.*
5. The contamination of air, water, or soil by substances that are harmful to living organisms. Pollution can occur naturally, for example through volcanic eruptions, or as the result of human activities, such as the spilling of oil or disposal of industrial waste. <u>The American Heritage® Science Dictionary</u>, *available at http://dictionary.reference.com/browse/pollution.*
6. The action of polluting especially by environmental contamination with man-made waste. *Available at www.merriam-webster.com/dictionary/pollution.*
7. "The presence and/or introduction into the environment of the substance or things that have harmful or poisonous effects." <u>New Oxford English Dictionary 2nd Edition</u>.

In addition, the Virginia General Assembly has consistently defined "pollution" as specifically

an environmental or outdoors event, such as:

1. **"Pollution"** means such alteration of physical, chemical, or biological properties of any state waters as will or is likely to create a nuisance or render such waters (a) harmful or detrimental or injurious to the public health…; (b) unsuitable with reasonable treatment for use…; or (c) unsuitable for…reasonable uses. *See* Va. Code Ann. § 62.1-44.3.
2. **"Pollution"** means such alteration of physical, chemical, or biological properties of any state waters resulting from sediment deposition as will or is likely to create a nuisance or render such waters (i) harmful…to the public health…or to the health of animals, fish or aquatic life. *See V*a. Code Ann. § 10.1-1181.1.
3. **"Air Pollution"** means the presence in the <u>outdoor</u> atmosphere of one or more substances which are or may be harmful or injurious to human health, welfare or safety…or which unreasonably interfere with the enjoyment by the people of life or property. *See* Va. Code Ann. § 10.1-1300 (emphasis added).
4. **"Pollution prevention"** means eliminating or reducing the use, generation or release at the source of environmental waste. *See* Va. Code Ann. § 10.1-1425.10.

The burden is on the insurer to prove that an exclusion applies. <u>White v. State Farm</u>, 208

Va. 394, 396, 157 S.E.2d 925, 927 (1967). In fact, the burden is on the insurer to prove that the

exclusion applies to the facts of the case. <u>Johnson v. INA</u>, 232 Va. 340, 345, 350 S.E.2d 616, 619 (1986).

The terms "pollution" and "pollutant" as set forth in the subject policies of insurance are oft-repeated environmental terms of art including terms such as "seepage" and "migration."[4] When considered as presented in the pollution exclusion, these terms have been construed by learned jurists throughout this country in a manner consistent with Edmonds' interpretation. Edmonds submits that this should be conclusive evidence <u>as a matter of law</u> that the interpretation of these defined and undefined terms, given their popular meaning, not only gives rise to a duty to defend, but also a duty to indemnify.

Whether or not the term "pollutant" is defined or undefined in the subject policies of insurance, the term necessarily has as its context environmental pollution. The New Oxford Dictionary shows "pollutant" as a derivative of the term "pollute" which is defined

> ...contaminate "water, air, or a place" with harmful or poisonous substances: the explosion polluted the town with dioxin...exposure to polluted air.

<i>Id.</i> at p.108

The insurers will argue that the term "pollutant" is defined in the policy as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." The Court must consider these terms in the context of their presence in a commercial liability policy, the history of the exclusions as set forth in several reported cases which appear elsewhere in this memorandum and the specific context of a drywall loss. It would again be simply unreasonable to conclude that these terms have any applicability in the context of the confines of a home as the further result of the characteristics of a product

---

[4] In a later portion of this memorandum, Edmonds sets forth that these terms are based on and indeed originate in the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C.A. §§ 96001 <i>et seq.</i>

used in the home.[5]    It should also be considered in the context of the amplifying terms "discharge, dispersal, seepage, migration, release or escape" which are also environmental terms of art used in remedial environmental legislation such as CERLCA.    To apply these in the context of a Chinese drywall loss is unreasonably broad.    These terms only make sense in the context of a traditional pollution event wherein "discharge" means "the action of allowing a liquid, gas, or other substance to flow from where it is confined."    New Oxford Dictionary at page 482.    The subject compounds alleged have been confined in the home and certainly do not result from anything that had been "previously confined."    These terms only make sense in a traditional environmental setting where escape of gasoline, oil or other toxins from pipelines, barrels, holding tanks or other industrial settings would take place in the commercial context. "Dispersal" means "the action or process of distributing things or people over wide areas."    New Oxford Dictionary at page 488.    This is certainly inapplicable in the context of an in home Chinese drywall loss involving unspecified compounds and gases.    Again, this only makes sense in the environmental context where a specific pollutant would be "dispersed."    "Seepage" means "the slow escape of a liquid or gas through porous material or small holes."    New Oxford Dictionary at page 1534.    Certainly there is no evidence set forth in the underlying Complaint of any such activity.    "Migration" is the noun for "migrate" which means "to move from one specific part of something to another."    New Oxford Dictionary at 1074.    This term only makes sense in an industrial environmental context and has no meaning within the confines of a home and is certainly ambiguous when applied to that context.    "Release" is defined in CERCLA elsewhere in this memorandum, but is also defined in the New Oxford Dictionary at 1430 as to "allow or enable to escape from confinement, set free."    This again only has meaning in the

---

[5] Nationwide must certainly agree—its policies—53PR-140-682-3001-- include coverage for gases, fumes and vapors in a building from materials brought into that building.

industrial environmental context which would mean releases from holding tanks, smoke stacks or other places, underground fuel tanks, above ground or underground tanks. The underlying Complaint sets forth no circumstance of any such "release" from "confinement." "Escape" means "break free from confinement or control" which has no applicability in the context of the subject loss and again only makes sense in the environmental industrial context.

All these terms when read together with the traditional, regulatory and dictionary concept of "pollutant" or "pollute" must lead to the conclusion that these terms are ambiguous in and of themselves and especially in the context of a Chinese drywall loss. It would be "unreasonable" to apply them in the subject context. Williams v. State Farm, *supra*.

As set forth in Lower Chesapeake, *supra*, the Supreme Court of Virginia held that insurance provisions that permit more than one reasonable interpretation are ambiguous and will be construed in a manner that provides coverage. *See also* Granite State Ins. Co. v. Bottoms, 243 Va. 228, 233, 415 S.E.2d 131, 134 (1992); Andrew v. American Health & Life Ins. Co., 236 Va. 221, 224, 372 S.E.2d 399 (1988) (the maxim *noscitur a sociis* mandated that the phrase "nervous disorder" when read in connection with other words in the exclusion could reasonably be construed to involve both physical disorders and mental disorders, and, therefore, the insured's construction of the term was reasonable and construed against the insurance company and in favor of coverage.)

Pollution exclusions such as present in the subject policies came to fruition as the result of the concern on the part of insurance companies using identical ISO forms nationally that the cost of statutory or regulatory government mandated "Superfund" type cleanups would ultimately be borne by them. These provisions were undeniably in response to the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA" or

"Superfund")[6] and similar legislation such as the Resource Conservation and Recovery Act[7], the Clean Water Act[8], and the Clean Air Act[9].  There is ample authority for consideration of all the wording of the whole exclusion is needed to determine its context in order to allow the provision to be read as a whole.  These readings are inconsistent with a drywall loss in a home.  *See* Andrews v. American Health & Life Ins. Co., *supra.*  In Nav-its Inc. v. Selective Ins. Co. of America, 869 A.2d 929, 930 (N.J. 2005), the New Jersey Supreme Court concluded that the pollution exclusion precluded recovery only for "traditional types" of pollution and refused to find that the exclusion was applicable to the claims by the policy holder in the context of a release of fumes in an office space.  In that case, the pollutants were defined as "any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."  *Id.* at 932.  Central to the Court's analysis was an examination of the drafting history and purposes behind the pollution exclusions including the undeniable fact that such terminologies appeared to address expanding liability under CERCLA.  *Id.* at 936.  The Court concluded that the pollution exclusion "in its various forms demonstrates that its purpose was to have a broad exclusion for traditional environmentally related damages."  *Id.* at 936-37.

In Belt Painting v. TIG Ins. Co., 795 N.E.2d 15 (N.Y. 2003) the Court of Appeals in the State of New York came to a similar conclusion, refusing to apply the pollution exclusion, even though "defined" in the policy as a result of bodily injury resulting from the inhalation of fumes in an office space.  In consideration of the words "pollution" and "environment", the Court declined to apply the exclusion based upon its undeniable purpose.  In that case, the policy broadly defined "pollutants" to include "fumes" and the New York Court of Appeals was

---

[6] 42 U.S.C.A. §§ 96001 et seq.
[7] 42 U.S.C.A. § 6901 et seq.
[8] 42 U.S.C.A. § 121 et seq.
[9] 42 U.S.C. § 1857 et seq., as amended

reluctant to adopt an interpretation that would infinitely enlarge the scope of the term "pollutant" and seemingly contradict both a "common speech understanding of the relevant terms and the reasonable expectations of a business person." *Id.* at 387. The Court ultimately concluded "it cannot be said that this language unambiguously applies to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander." *Id.* at 387-388.

In <u>NGM Insurance Co. et al. v. Carolina's Power Wash & Painting LLC et al.</u>, No. 08-3378, 2010 U.S. Dist. LEXIS 2362 (D.S.C. Jan. 13, 2010), the policy holder faced potential liability for alleged injuries suffered by postal workers during painting of the post office. In that case, even though "pollutants" was <u>actually defined</u> to include any "irritant or contaminant" as well as "fumes" the Court considered the exclusion ambiguous in such a context and found that "no discharge, dispersal, seepage, migration, release or escape" occurs when such fumes drift a short distance from the work area. As a result, the District Court found the exclusion ambiguous, and in accordance with basic tenets of policy interpretation identical to those applicable pursuant to Virginia law, construed it in favor of the policy holder.

In <u>National Casualty Ins. v. Ally and Transport, Inc.</u>, 8-09-1539 2010 U.S. Dist. LEXIS 15004 (S.D. Tex. Feb. 22, 2010), the policy holder's trailer exploded and killed a maintenance worker. In this suit, it was alleged that the trailer had been used to transfer oil that left a "dangerous and explosive residue" in the trailer. As a result, the insurer filed a declaratory judgment action, citing a pollution exclusion that was fully defined. Despite the definition similar to those that have appeared in other cases, the District Court held that the exclusion did not bar coverage and was ambiguous inasmuch as the underlying injury did not involve a "discharge, dispersal, seepage, migration, release or escape." Although the policy language was

different the Court was in agreement with cases finding that the exclusion applies only to "traditional" pollution discharge into the environment. Similarly, in Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178 (6th Cir. 1999), the absolute pollution exclusion did not preclude coverage for injuries caused by toxic substances confined to the general area of their intended use. The trial court had considered the case of a teacher who was injured as a result of fumes from chemicals used to seal a floor in the school where the teacher worked. Even in the face of the parties' agreement that the sealant constituted a "pollutant", the trial court ruled for the insured, stating

> The pollution exclusion clause is intended to protect the insurer from liability for the enforcement of environmental laws. The exclusion contains environmental terms of art because it is intended to exclude coverage only as it relates to environmental pollution. When a toxic substance is confined to an area of intended use it does not come under the exclusion clause.

Id. at 1180-1181.

The Court held "no reasonable person could find that the insurance policy at issue unambiguously excluded coverage for injuries suffered by an employee who was legitimately in the immediate vicinity of the chemicals, and the injury occurred only a few feet from where the chemicals were being used." Id. at 1183. Given such reasoning, why would the insureds' interpretation be any less reasonable? Numerous learned high courts across the country have similarly concluded that coverage exists. The insureds therefore advance a reasonable interpretation of purely environmental terms of art such as "pollution", "seepage", "migration", "discharge", "dispersal", "release" and "escape" based upon ample judicial, contextual and regulatory precedent, which this Court should adopt.

In Porterfield v. Audubon Indemnity Co., 856 So.2d. 789 (Ala. 2002), the Supreme Court of Alabama held that in the specific context of the separation of particles of lead paint from the

interior surfaces of a residential apartment, the terms "discharge", "dispersal", "release" or "escape" are reasonably susceptible to two or more constructions and there is reasonable doubt and confusion as to their meanings, especially since those words are terms of art that imply an active or clearly perceived physical event, especially when used together and ordinarily would be understood not to apply to the imperceptible chipping or flaking of lead paint which is attributed not to an act or physical event but rather to an involuntary effect occurring over a considerable period of years." See also, Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co., 35 F.3d 494 (10th Cir. 1994) (in spite of the insurer's urging that the carbon monoxide emissions in an apartment were not covered events as a result of the absolute pollution exclusion, the terms "irritant" and "contaminant" are not read in isolation but must be construed as substances generally recognized as coming from the environment and must occur in a setting substantially recognized as a toxic and particularly harmful substance by industry and government regulators."); Motorist Mut. Ins. Co. v. RFJ Inc. et al., 926 S.W.2d 679 (Ky. App. 1996) (the Court of Appeals of Kentucky found that the pollution exclusion was inapplicable in the case of a carbon monoxide leak in a dry cleaning business under a typical "Subsection f" pollution exclusion based upon consideration of the well documented historical perspective and the continued use of the environmental law terminology in framing the exclusion, therefore coverage was mandated.);  National Grange Mutual Ins. Co. v. Caraca, 2006 Conn. Super. LEXIS 815 (Ct. 2006) (the absolute pollution exclusion is ambiguous as a matter of law and inapplicable to asbestos dust created by the sanding of floors and released into a home as one could conclude that the terms "discharge, dispersal, seepage, migration, release or escape" apply to outdoor environmental pollution only.); Clendenin Bros. Inc. v. United States Fire Ins. Co., 290 Md. 449, 889, A.2d 387 (Md. 2006) (the Court of Appeals of Maryland found the absolute pollution

exclusion ambiguous as drafted by the insurer and not intended to bar coverage where the insurer's alleged liability may be caused by non-environmental localized workplace fumes.)

In <u>Unisun Ins. Co. v. Schulwolf</u>, 53 Va. Cir. 220 (Norfolk Cir. Ct. 2000), the court held that claims arising from deteriorating lead-based paint do not fall within the pollution exclusion as it is reasonable to interpret such clause as applying to environmental pollution and the insurer's position was likewise reasonable, therefore deeming the clause ambiguous and mandating coverage.  In <u>Marshall v. Selective Ins. Co.</u>, 46 Va. Cir. 502 (Norfolk Cir. Ct. 1995) the Court held that the pollution exclusion was ambiguous and inapplicable to a loss that resulted from carbon monoxide fumes within a residential dwelling because the term "atmosphere" was susceptible to two or more meanings.

## C.  Reference to federal and Virginia authority regulating pollution provides relevant context to the exclusionary language and supports coverage for Edmonds' loss

Reference to federal and Virginia legislation and regulations in the field of pollution provides important context to the words urged by the insurers to deny coverage, and supports Edmonds' "reasonableness" argument that coverage should be granted to Overlook for its loss from Chinese drywall.   The Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), for example, according to U.S.C. § 9601, *et seq.*, offers several relevant definitions that support an interpretation of the pollution exclusion as not applying to a compound originating in and remaining within the insured's residence.  The term "environment" is defined to mean "the navigable waters, the waters of the contiguous zone, and the ocean waters … or ambient air within the United States or under the jurisdiction of the United States." 42 U.S.C. § 9601 (8)(A) & (B).  The term "release" means "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leeching, dumping, or disposing

*into the environment*...." 42 U.S.C. § 9601 (22) (emphasis added).  CERCLA defines the term "pollutant" or "contaminant" as any "element, substance, compound or mixture including disease causing agents, which after release *into the environment* and upon exposure, ingestion, inhalation or assimilation into any organism, either directly from the environment or indirectly by ingestion through food chains, will or may reasonably be anticipated to cause death, disease, behavioral abnormalities, cancer, genetic mutation, physiological malfunctions (including malfunctions in reproduction) or physical deformations, in such organisms or their offspring...." *See* 42 U.S.C. § 9601 (33) (emphasis added).

The compounds at issue are not classified as being particularly dangerous.  In typical homes, they are at low levels and are likely activated by synergistic reactions with other conditions (heat and humidity) in the home.  There is no "seepage", "migration", "release" or "escape."  The reactions are complex and do NOT define a pollution event.  The Consumer Products Safety Commission noted that the measured levels were such that a causal connection with health effects of any kind was uncertain.  Edmonds' interpretation, backed by federal law, is therefore reasonable.

Inasmuch as the terms "discharge, dispersal, seepage, migration, release or escape" are terms that are featured prominently throughout CERCLA, this certainly gives significant context to Edmonds' argument that his interpretation of this provision as *not* excluding coverage for a circumstance occurring within his own home would be preeminently reasonable.

Gases (undefined and unspecified) in a home in small amounts is not the dispositive question, since such gases and compounds do not impact the environment in the sense contemplated by a reasonable view of the term "pollutant" or "environment."  They do not "seep", "migrate" or "release" in a manner contemplated by the exclusion as describing a

pollution event.  The context of the urged pollution exclusion and the identity of terminologies that appear in federal anti-pollution legislation such as CERCLA are undeniable.  They are not "pollutants" by any definition.

It is also noteworthy that CERCLA does not apply to releases "from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures." 42 U.S.C. §9604(a)(3)(B).  <u>First United Methodist Church of Hyattsville v. U.S. Gypsum Co.</u>, 82 F.2d 862, 868 (4th Cir. 1969).  The relevant Virginia definitions were referenced at page 14 of this memorandum and similarly seem to define pollution in traditional environmental terms.


## CONCLUSION

This Court should hold as urged by The Overlook, LLC in its Motion for Partial Summary Judgment that the pollution exclusion is inapplicable to the subject loss and is additionally ambiguous so as to invoke coverage under the relevant policies.


DATED: <u>November 29, 2010</u>                          RICKY L. EDMONDS, Defendant


                                                                          by: _____/s/_____
                                                                          Of Counsel

Michael F. Imprevento, Esq. (VSB#23926)
mimprevento@breitdrescher.com
Jeffrey A. Breit, Esq. (VSB#18876)
jbreit@bdbmail.com
John W. Drescher, Esq. (VSB#13656)
jdrescher@breitdrescher.com
BREIT, DRESCHER, IMPREVENTO & WALKER, P.C.
1000 Dominion Tower
999 Waterside Drive

Norfolk, VA 23510
Phone: (757) 622-6000
Facsimile: (757) 670-3939
*Co-counsel for Defendant*

Richard J. Serpe, Esq. (VSB#33340)
rserpe@serpefirm.com
LAW OFFICES OF RICHARD J. SERPE, P.C.
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Facsimile: (757) 233-0455
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of November, 2010, I caused a true copy of the foregoing Defendant Ricky L. Edmonds' Reply Memorandum in Response to Defendant The Overlook, LLC's Motion for Partial Summary Judgment to be sent via electronic transmission to the following:

Lawrence A. Dunn, Esquire
Grant E. Kronenberg, Esquire
Morris & Morris, PC
700 E. Main Street, Suite 1100
Richmond, Virginia 23218
Tel.: (804) 344-8300
Fax: (804) 344-8359
LDunn@morrismorrs.com
*Counsel for Plaintiffs*

Catherine M. Colinvaux, Esquire
Zelle Hofmann Voelbel & Mason LLP
950 Winter Street, Suite 1300
Waltham, Massachusetts 02451
Tel: (781) 466-0700
Fax: (781) 466-0701
CColinvaux@zelle.com
*Counsel for Plaintiffs*

Scott J. Ryskoski, Esquire
Ryskoski Law, P.L.L.C.
556 Silicon Drive

Suite 100
Southlake, Texas 76092
Tel: (817) 310-3527
Fax: (817) 310-0141
sjr@ryskoskilaw.com
*Counsel for Plaintiffs*

John J. Rasmussen, Esquire
Recovery Law Group, PLC
P.O. Box 8049
Richmond, Virginia 23223
Tel: (804) 308-1359
Fax: (804) 308-1349
jjr@insurance-recovery.com
*Counsel for Defendants The Overlook, LLC, Steven A. Middleton, and Vista Middleton, LLC*

　　　　　　　　　　　　　　　/s/
Michael F. Imprevento
Breit, Drescher, Imprevento & Walker, P.C.
1000 Dominion Tower
999 Waterside Drive
Norfolk, VA 23510
Phone: 757-670-3884
Fax: 757-299-8035
mimprevento@breitdrescher.com
*Counsel for Defendant Edmonds*