UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

NATIONWIDE MUTUAL INSURANCE
COMPANY, and

NATIONWIDE MUTUAL FIRE
INSURANCE COMPANY, and

NATIONWIDE PROPERTY & CASUALTY
INSURANCE COMPANY,

        Plaintiffs,

v.

THE OVERLOOK, LLC, and

STEVEN A. MIDDLETON, and

VISTA MIDDLETON, LLC, and

RICKY L. EDMONDS,

        Defendants.

Civil Action No. 4:10cv69

```
FILED

MAY 1 3 2011

CLERK, U.S. DISTRICT COURT
     NORFOLK, VA
```

## OPINION AND ORDER

On January 19, 2010, Plaintiffs Nationwide Mutual Insurance Company, Nationwide Mutual Fire Insurance Company, and Nationwide Property and Casualty Insurance Company (collectively "Nationwide") filed a Complaint in the Richmond Division of this Court, seeking a declaratory judgment that Nationwide has no duty to defend or indemnify the Defendants - The Overlook LLC, Steven A. Middleton, Vista Middleton, LLC (collectively "Overlook") and Ricky L. Edmonds ("Edmonds") - under several relevant insurance policies.  After a transfer of the case to

this Division, and significant motions practice, there are four principal motions before this Court – Nationwide's motion for summary judgment, Edmonds' motion to stay Nationwide's motion for summary judgment, Overlook's motion for summary judgment, and Edmonds' motion for summary judgment.  Nationwide has also filed a motion for leave to file an amended complaint.  For the reasons set forth below, the Court **GRANTS IN PART** Nationwide's motion for summary judgment.  Specifically, the Court concludes that Nationwide does not have a duty to defend Overlook in Edmonds' underlying state lawsuit, based on the Pollution Exclusion in the applicable insurance policies.  As a result, Nationwide also has no duty to indemnify Overlook with respect to Edmonds' state suit.  Consequently, the Court **DENIES** the motions for summary judgment filed by Overlook and Edmonds, which requested a declaratory judgment that Nationwide has a duty to defend Overlook in the underlying Edmonds lawsuit. However, given the previous discovery stay in this matter and the absence of "litigated facts" on the subject of how the damages *actually* occurred in the "Non-Edmonds" homes, the Court **HOLDS ITS DECISION IN ABEYANCE**, on the subject of Nationwide's duty to indemnify Overlook with respect to the homes for which there are no underlying lawsuits, until the parties are able to develop sufficient facts on the issue or until Nationwide

2

advances alternative legal grounds for summary judgment that do not require significant factual discovery.[1]

With respect to the pending motion to amend the Complaint, which asks that Nationwide be granted leave to add allegations to the Complaint regarding two other actions that Edmonds has filed - the Wiltz and Amato actions - the Court will address that motion in a separate Order.

## I. Facts and Procedural History

### A. Facts

This is an action regarding Nationwide's duty to defend and indemnify its insured, real estate developer Overlook, with respect to damage caused by defective drywall imported from China and installed in homes built by Overlook. Overlook is a real estate developer that owned real property in Richmond, Virginia, where it developed a complex known as the "Overlook Townhouses." (Compl. ¶ 15; Answer and Counterclaim ¶ 15). Between July 2, 2006 and May 30, 2008, Overlook sold at least ten of the affected units to individuals and families. However, to the Court's knowledge, Overlook still owns several unsold units. (Compl. ¶ 16, Answer and Counterclaim ¶ 16; Colinvaux Aff. Ex. 8, at 1-3). Of the units sold, one was purchased by Edmonds, a Defendant in this action.

---

[1] The Court will issue a subsequent Order, following this Opinion and Order, which will discuss the manner in which the Court will proceed on the "Non-Edmonds" claims.

By 2009, Overlook became aware that defective drywall imported from China may have been installed in some of the homes it constructed - with the suspicion subsequently confirmed through further investigation.   While the parties dispute the exact method by which such drywall causes damage, it is undisputed that it is problematic in a home and should be removed.   Therefore, in a May 22, 2009 letter that Overlook sent the owners of its townhomes, it encouraged them to have their homes inspected at Overlook's expense. (Colinvaux Aff. Ex. 9). Where the homes were found to contain the imported drywall, Overlook told the owners that it would "work with [them], the Unit Owners Association, the general contractor, the suppliers and the appropriate insurance companies to formulate a plan to determine how to best address the situation." Id.

In light of this offer and subsequent fact-finding by Overlook, Overlook removed and replaced the defective drywall and other property in the affected homes.   In return, the owners of the repaired homes signed agreements releasing Overlook from claims and liabilities arising out of the defective drywall. (See, e.g., Colinvaux Aff. Ex. 14).   Overlook also removed and replaced the affected drywall from the unsold units which it still owned.   However, there is one unit that Overlook has not repaired - the unit owned by Edmonds.

4

Edmonds refused the offer from Overlook as unacceptable and has since filed or is participating in several lawsuits against Overlook.  As to the Virginia suit, on September 3, 2009, Edmonds filed suit against Overlook and other defendants in the Circuit Court for the City of Norfolk, styled Edmonds v. Parallel Design & Dev. L.L.C., Case No. CL09005697-00.  It is this suit brought by Edmonds that will be the principle focus of this Opinion and Order.  However, since the filing of this declaratory judgment action, two additional suits have been brought against Overlook.  On February 10, 2010, Edmonds brought a second suit, filing as part of a putative class action in the United States District Court for the Eastern District of Louisiana, styled Wiltz v. Beijing New Building Materials Public Limited Co., 2:10cv361.  On March 19, 2010, Edmonds brought another suit against Overlook in the Eastern District of Louisiana, also filing as part of a putative class action, styled Amato v. Liberty Mutual Insurance Co., 2:10cv932.  Since these lawsuits were filed after Nationwide filed its Complaint, and are thus not part of the current Complaint, the Court will not address these two lawsuits in this Opinion and Order.  However, Nationwide has filed a motion to amend its complaint to include these lawsuits in its current declaratory judgment action.  The Court will address that motion to amend in a

separate Order.   This Opinion and Order will address, however, the lawsuit Edmonds filed in Norfolk Circuit Court.

### 1. Edmonds v. Parallel Design and Development[2]

Edmonds filed suit in the Circuit Court for the City of Norfolk against Parallel Design and Development, LLC, The Overlook, LLC, Venture Supply Inc. and The Porter-Blaine Corp. In this suit, Edmonds claims that his "family home located [on] Holly St....[in] Richmond, VA, 23220...was built with defective drywall by Overlook and Parallel [Design and Development, L.L.C.]."   (Colinvaux Aff. Ex. 16, at ¶ 1).   Allegedly, this drywall used in his home "is inherently defective because it emits various sulfide gases and/or other toxic chemicals through 'off-gassing' that create noxious odors, and cause damage and corrosion...to the structural, mechanical and plumbing systems of the Plaintiff's home...."   Id. at ¶ 11.   Further, the "compounds emitted by the drywall at issue are also capable of, among other things, harming the health of individuals subjected to prolonged exposure."   Id. at ¶ 12.   The "chemical compounds cause and have caused dangerous health consequences including, among other things, allergic reactions, respiratory afflictions, sinus and bronchial problems requiring medical attention,

---

[2] The allegations in Edmonds Suit are not in dispute and are taken directly from his complaint in his state lawsuit. (See Colinvaux Aff. Ex. 16).

6

including headaches suffered by the Plaintiff." Id.
Additionally, as to health consequences, the state court
complaint alleges that "some of the compounds being emitted from
Defendants' defective drywall are very hazardous, some latently
affecting the central nervous system and basic oxygenation on a
cellular level." Id. at ¶ 58.

As a result of these underlying factual allegations,
Edmonds asserted twelve counts against the defendants in the
state action, although not all counts were asserted against each
defendant. These counts included: Breach of Contract, Breach of
Express Warranty, Breach of Implied Warranties, Negligence,
Negligence Per Se, Unjust Enrichment, Private Nuisance,
Equitable Relief, Injunctive Relief, and Medical Monitoring,
Breach of Implied Warranty of Merchantability, Breach of Implied
Warranty of Fitness for a Particular Purpose, Violation of
Consumer Protection Act, and Fraud. These claims are relevant
to this action because Nationwide has issued several insurance
policies to Overlook in recent years that contain language which
obligates Nationwide to defend and indemnify Overlook from
lawsuits if certain conditions are met.

### 2. The Subject Insurance Claims

Because of the existence of these policies, on May 20,
2009, counsel for Overlook informed Nationwide by letter that it
had "recently learned that the town home project, The Overlook

7

Townhouses,...may contain imported Chinese Drywall." (Sjullie Aff. Ex. 1, at 1). This letter was to put Nationwide "on notice of all potential claims for property damage; personal injury; breach of contract; breach of warranty; indemnification; contribution; and any and all other related claims arising from the use of [defective drywall]...." Id. at 2. The Edmonds suit pending in Norfolk Circuit Court was filed shortly thereafter, in September 2009. To date, Nationwide is participating in Overlook's defense of the Edmonds Norfolk Circuit Court suit, subject to a reservation of rights.

There are a total of twenty-six insurance policies issued by various Nationwide entities that are at issue in the present action. Although there are a number of policies, they generally include one of three types of coverage. First, some of the policies provide property insurance, which requires Nationwide to "pay for direct physical loss of or damage to Covered Property...." (Sjullie Aff. Ex. 4). Second, liability insurance provides that Nationwide "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." (Sjullie Aff. Ex. 8). Third, excess (or "umbrella") liability insurance provides that Nationwide "will pay on behalf of the 'insured' that part of 'loss' covered by this insurance in excess of the total applicable limits of" underlying

liability insurance. (Sjullie Aff. Ex. 28).   Nationwide argues in its motion for summary judgment that the Pollution Exclusion in all of the relevant policies prevents it from having to cover losses associated with defective drywall.

### 3. Pollution Exclusion

Despite the differences between the Nationwide property, liability, and excess liability policies, they all contain similar Pollution Exclusions.  All of the relevant coverages in the applicable Nationwide policies include a definition of the term "pollutants."  Although there are minor wording variations across the policies, "pollutants" are generally defined as "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste."   (Nationwide's Mem. Supp. Mot. Summ. J. 12; Sjullie Aff. Ex. 8).

As to the Nationwide Property Coverages, they all state that "[w]e will not pay for loss or damage caused directly or indirectly by any of the following.... [d]ischarge, dispersal, seepage, migration, release or escape of pollutants...." (Sjullie Aff. Ex. 4) (internal quotations omitted).

As to the Nationwide Liability and Excess Liability Coverages, the language of their Pollution Exclusions vary.  All of the Nationwide Liability and certain of the Excess Liability Coverages provide that the liability insurance "does not apply

to:"

    1) "Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants:"

    a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured.
      ...

    d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor. However, this subparagraph does not apply to:
      ...
    (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor....

(Sjullie Aff. Ex. 8).

      In the remaining Excess Liability policies, the Pollution Exclusion applies to exclude all "'[b]odily injury', 'property damage'...which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time." (Sjullie Aff. Ex. 28).

## B. Procedural History

### 1. Federal Complaint

Nationwide's Complaint seeks a declaratory judgment on a number of different issues. (Docket No. 1). First, in Count I, the Complaint seeks a declaration that "Nationwide has no obligations under the property coverages of the Nationwide Policies in connection with the Overlook Property Coverage Claims." (Compl. p. 49). These property coverage policies apply to direct physical loss of or damage to covered property – specifically property that Overlook still owns. Second, in Count II, Nationwide seeks a declaration that it "has no obligation under the Nationwide Policies to defend Overlook in connection with the Overlook Liability Coverage Claims." Id. In Count III, Nationwide seeks a declaration that it "has no obligation under the Nationwide Policies to indemnify Overlook in connection with the Overlook Liability Coverage Claims." Id. at 50. In Count IV, Nationwide seeks a declaration that "Nationwide has no obligation under the Nationwide Policies to defend Overlook in connection with the Edmonds Lawsuit." Id. In Count V, Nationwide requests a declaration that it "has no obligation under the Nationwide Policies to indemnify Overlook in connection with the Edmonds Lawsuit." Id. In response to this Complaint, Overlook filed a counterclaim, asserting a Breach of Contract claim against Nationwide, grounded in

11

Nationwide's refusal to provide insurance coverage stemming from such drywall damage.

After significant motions practice, on October 7, 2010, Nationwide moved the Court for an Order granting it leave, pursuant to Local Rule 56(c), to file a motion for summary judgment limited to the issue of whether the Pollution Exclusion in the insurance contracts eliminates Nationwide's duty to defend and indemnify Overlook. (Docket No. 47). On October 25, 2010, the Court held a status conference between the parties to discuss the issues raised in that motion. Following that conference, the Court issued an Order on November 1, 2010. (Docket No. 73). In that Order, the Court granted Plaintiffs leave to file a motion for summary judgment solely on the legal issue of whether the Pollution Exclusion barred coverage in this case. Since Nationwide's motion was to solely address legal issues, the Court's Order stayed factual discovery. Id. Subsequently, Nationwide filed its motion for summary judgment, which was followed by a number of motions from the Defendants, including cross motions for summary judgment.

### 2. Nationwide's Motion for Summary Judgment

Nationwide's motion for summary judgment makes two principal arguments with respect to the Pollution Exclusions in the current case. The first argument involves Overlook's requests for reimbursement for expenses incurred repairing

12

homes, other than the one owned by Edmonds.  Importantly, in order for the Court to make a determination as to whether these expenses fall within the policies' coverage provisions, Nationwide must present "litigated facts" that the Court can compare to the policy language in determining whether coverage exists.

The second argument in Nationwide's motion, and the one that this Opinion and Order addresses, involves Overlook's claims relating to Edmonds' property.  According to Nationwide, it has no obligation to defend or indemnify Overlook with respect to the Edmonds lawsuits, because under the Eight Corners Rule,[3] the "allegations of the *Edmonds* complaints fall squarely within the Pollution Exclusions in the Nationwide Liability and Excess Liability Coverages." (Nationwide's Mem. Supp. Mot. Summ. J. 22).  This argument is not limited to Edmonds' suit in the Circuit Court for the City of Norfolk, but rather involves the Wiltz and Amato actions as well.  However, because the Court has not yet addressed Nationwide's motion to add the other two lawsuits to the Complaint, and because the parties have not had an opportunity to brief the summary judgment motion with respect to those lawsuits, this Opinion and Order only addresses the

---

[3] The Eight Corners Rule is discussed extensively in the subsequent sections of this Opinion and Order.

Edmonds suit pending in the Circuit Court for the City of Norfolk.

### 3. Edmonds' Motion to Strike

On October 29, 2010, Edmonds "move[d] this Court to strike the Plaintiffs' Motion for Summary Judgment, or, in the alternative, hold consideration of it in abeyance until the close of discovery...."   (Edmonds' Mot. to Strike; Docket No. 71).   Edmonds' principal argument in that motion is that the Court imposed limitations on the reach of Nationwide's motion for summary judgment both in the status conference between the parties and the Court's subsequent November 1, 2010 Order. According to Edmonds, Nationwide's motion exceeds those limits. From Edmonds' perspective, the Court stayed factual discovery because Nationwide's motion was only supposed to argue purely legal issues.   Therefore, Edmonds argues the Court should only consider Nationwide's obligations with respect to the Edmonds claims – the resolution of which does not require the Court to make factual determinations – and hold in abeyance any decision on Nationwide's coverage obligations with respect to the other twelve units until the parties have completed sufficient factual discovery for "litigated facts" to be determined.

### 4. Overlook's Stance on the Reach of Nationwide's Motion

While Overlook did not respond to Edmonds' motion to strike, in its memorandum in opposition to Nationwide's summary

14

judgment motion it attaches a Rule 56(f) declaration from John J. Rasmussen, counsel for Overlook.[4] (Overlook's Mem. Opp'n Mot. Summ. J Ex. A; Docket No. 77). In this declaration, Rasmussen requests a continuance in the event that the Court is inclined to grant the motion for summary judgment. During this continuance, Rasmussen asserts that Overlook "intend[s] to provide expert reports and other expert discovery regarding the science behind the type of harm allegedly caused by drywall that [Overlook] believe[s] will show the pollution exclusion does not apply." Id. Overlook did not provide such evidence at the time of its response to the motion because "[t]heir time to provide such expert reports did not expire before discovery was stayed." Id. Therefore, while Overlook believes that the duty to defend in the underlying Edmonds action can be determined based on the Eight Corners Rule, it contends that the Court cannot make a

---

[4] Under the version of Rule 56(f) that was effective until December 1, 2010 and thus applicable to Overlook's filing, "[i]f a party opposing the motion shows by affidavit that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) deny the motion; (2) order a continuance to enable affidavits to be obtained, depositions to be taken, or other discovery to be undertaken; or issue any just order." Fed. R. Civ. P. 56(f) (modified Dec. 1, 2010). However, under the most recent amendments to the Federal Rules of Civil Procedure, that provision is now located in Rule 56(d). According to the Amendment notes, "[s]ubsection (d) carries forward without substantial change the provisions of former subdivision (f)." Fed. R. Civ. P. 56(d) advisory committee's note.

duty to indemnify determination at this point in the proceedings because such a determination requires factual discovery.

### 5. Overlook's Motion for Summary Judgment

On November 17, 2010, Overlook responded to Nationwide's motion for summary judgment by also filing its own motion for summary judgment. (Docket No. 81). In this motion, which is limited to Nationwide's duty to defend Overlook in the Edmonds action, Overlook seeks a declaration that Nationwide has a duty to defend Overlook against Edmonds' complaint because, according to Overlook, the Pollution Exclusion does not act to bar coverage on the facts of this case. In the alternative, Overlook contends that even if the exclusion does apply to *some* of the claims in Edmonds underlying lawsuit, many of Edmonds allegations do not implicate the alleged defect in the drywall and thus do not trigger the Pollution Exclusion. Therefore, according to Overlook, since *some* of the claims are not excluded from coverage under the Pollution Exclusion, Nationwide has a duty under Virginia law to defend Overlook as to all the claims in the Edmonds action pending in the Circuit Court for the City of Norfolk.

### 6. Edmonds Motion for Summary Judgment

On November 29, 2010, Edmonds also filed a motion for summary judgment. (Docket No. 88). This motion requests that the Court declare, as a matter of law, that Nationwide must

defend Overlook in the underlying Edmonds suit.   While this motion raises substantially the same arguments as can be found in Overlook's Motion, it does also point to a different paragraph in the Pollution Exclusion, not previously raised by any party, that Edmonds contends requires Nationwide to defend Overlook.[5]

### 7. Motion Hearing and Certification

The Court heard extensive oral argument on these summary judgment motions on March 8, 2011.   During this oral argument, the Court advised the parties that, consistent with its prior ruling and Order, it only intended to rule on that portion of the summary judgment motion involving the underlying Edmonds state court complaint - because that was the only portion of the summary judgment motion that raised purely legal issues.   The rest of the issues raised in Nationwide's summary judgment motion require the determination of facts - "litigated facts" - since the parties have not stipulated to such facts.[6]   As to the

---

[5] Although raised for the first time by Edmonds, this provision is noted above in the Court's recitation of the relevant policy language.   The provision provides an exception to one of the subparagraphs in the Pollution Exclusion, stating that that subparagraph does not apply to injury or damage "sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building...."   The applicability of this provision will be discussed below.

[6] The summary judgment motion that Nationwide filed asked the Court to adjudicate its defense and indemnity obligations with respect to damage caused in Edmonds' home - reflected in

legal issue regarding Nationwide's duty to defend and indemnify Overlook with respect to Edmonds' state court claims, Edmonds' counsel indicated at the hearing that he had planned to file a motion requesting that the Court certify the Pollution Exclusion coverage issue to the Supreme Court of Virginia, but had not yet done so. See R. Sup. Ct. Va. 5:40. Such certification motion was filed on March 9, 2011, and this Court entered an Order of Certification to the Supreme Court of Virginia on April 12, 2011. (Docket No. 121). In this Order of Certification, the Court posed the following question to the Supreme Court:

> In the pollution exclusion clause of the relevant insurance contracts, is the definition of "pollutant," as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," ambiguous, 1) because it could be interpreted to apply only to traditional environmental pollutants, 2) because it is so broad that it could cover virtually any substance and potentially lead to absurd results, or 3) because it is substantively unreasonable?

By Order of April 22, 2011, the Supreme Court of Virginia "declined to accept this certified question of law." (Docket

---

Edmonds' underlying lawsuit - as well as damage caused in the units owned by other individuals and Overlook itself - which are not the subject of any underlying lawsuits. As discussed in later sections, the Edmonds' claims are the only claims discussed in Nationwide's Complaint which do not require further factual development before the Court is able to determine whether the claims are excluded from coverage based on the relevant Pollution Exclusions. As a result, the Court informed the parties that it would address Edmonds' claims in this Opinion and Order, while eventually allowing additional discovery with respect to those other units.

No. 129).  As a result, the Court addresses the reach of the Pollution Exclusion below.

## II. Standard of Review

### A. Applicable Law

This case was brought before this Court under diversity of citizenship jurisdiction.  (Compl. ¶ 12).  In suits filed in federal court under diversity jurisdiction, questions of procedural law are governed by federal law, e.g., Gasperini v. Ctr. for Humanities, Inc., 518 U.S. 415, 427 (1996), whereas questions of substantive law are governed by the law of the forum state, e.g., Salve Regina Coll. v. Russell, 499 U.S. 225, 226 (1991) (stating that this rule applies "absent a federal statutory or constitutional directive to the contrary").  See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938)).  Since Virginia is the forum state, under Virginia law, "'the law of the place where an insurance contract is written and delivered controls issues as to its coverage.'"  Firemen's Ins. Co. v. Kline & Son Cement Repair, Inc., 474 F. Supp. 2d 779, 788 (E.D. Va. 2007) (quoting Buchanan v. Doe, 246 Va. 67 (1993)).  Given that Nationwide has introduced evidence that the policies were delivered in Virginia, (Sjullie Aff. ¶ 6), and that evidence is not contradicted by Overlook or Edmonds, such a state of facts is reasonable to infer.  Therefore, while this Court must apply the federal standard for summary judgment, Gen. Accident Fire

and Life Assurance Corp., Ltd. v. Akzona, Inc., 622 F.2d 90, 93 n.5 (4th Cir. 1980), the underlying insurance contract issue must be analyzed under Virginia law. See, e.g., Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635-36 (4th Cir. 2005).

## B. Summary Judgment Standard

"Summary judgment is particularly well-suited for resolution of insurance coverage disputes because the construction of insurance contracts is a legal question." Mount Vernon Fire Ins. Co. v. Adamson, Case No. 3:09cv817, 2010 U.S. Dist. LEXIS 106758, at *4 (E.D. Va. Sept. 15, 2010) (citations omitted). According to Rule 56 of the Federal Rules of Civil Procedure, "[a] party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is sought." Fed. R. Civ. P. 56(a). The Rule goes on to state that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The mere existence of some alleged factual dispute between the parties "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986). Furthermore, only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be considered by a court in its determination. Id. at 248.

Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute of fact exists. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). At that point, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. In doing so, the judge must construe the facts in the light most favorable to the non-moving party, and may not make credibility determinations or weigh the evidence. Id. at 255; Holland v. Wash. Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007). However, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). While the Court must observe the above-mentioned federal procedure in assessing motions for summary judgment, it must apply the substantive law of Virginia in the present case.

## C. Virginia Law of Insurance Contracts

### 1. Duty to Defend and Duty to Indemnify

Since Nationwide has requested declaratory judgments on the issues of both its "duty to defend" and "duty to indemnify" Overlook, the Court will briefly address the rules of decision with respect to those two duties, before addressing general principles of Virginia insurance contract interpretation.

"Under Virginia law, an insurer's duty to defend arises 'whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy.'" Penn-America Ins. Co. v. Coffey, 368 F.3d 409, 413 (4th Cir. 2004) (quoting Brenner v. Lawyers Title Ins. Corp., 240 Va. 185 (1990)). Duty to defend questions do "not require the district court to resolve factual questions at all. It need only decide such coverage by comparing what [the state court Plaintiff] has alleged in the state court action with the language of the [provider's] insurance policy." Id. "[T]here is no duty to defend 'if it appears clearly that the insurer would not be liable under its contract for any judgment based upon the allegations.'" Id. (quoting Brenner, 240 Va. at 189). Since courts must only compare the allegations contained within the four corners of the complaint to the terms contained within the four corners of the insurance contract, this standard of review for duties to defend is often referred to as the

22

"Eight Corners Rule." See CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co., 566 F.3d 150, 155 (4th Cir. 2009); Capitol Envtl. Servs. v. N. River Ins. Co., 536 F. Supp. 2d at 640 n. 14 (quoting Solers, Inc. v. Hartford Cas. Ins. Co., 146 F. Supp. 2d 785, 791 (E.D. Va. 2001)) ("The Eight Corners Rule is a combination of the Exclusive Pleading Rule, under which 'an insurer's duty to defend is determined solely by the claims asserted in the pleadings' and the Potentiality Rule, under which "an insurer's duty to defend is triggered if there is any 'potentiality' that the allegations in the pleadings could state a claim that would be covered by the policy.").

The duty to indemnify, on the other hand, is different than the duty to defend. It is a narrower obligation. Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP, 355 F. App'x 698, 704 (4th Cir. 2009) (unpublished). "While the duty to defend is based on the allegations in the underlying complaint, the duty to indemnify relies on litigated facts." CACI Int'l, Inc., 566 F.3d at 155. "'An insurer's duty to defend is triggered if there is any possibility that a judgment against the insured will be covered under the insurance policy[,]'" id. (quoting Bohreer v. Erie Ins. Grp., 475 F. Supp. 2d 578, 584 (E.D. Va. 2007)), whereas "[t]he duty to indemnify...refers to an insurer's responsibility to pay a monetary award when its insured has become liable for a covered

23

claim." Perdue Farms, Inc. v. Travelers Cas. & Sur. Co. of Am., 448 F.3d 252, 257-58 (4th Cir. 2006).

In order to make this indemnification determination, where there is an underlying state suit, the court considering the duty to indemnify question must generally analyze the ultimate findings of fact in the underlying state suit once it is concluded, rather than making its own evidentiary findings in the first instance. Builders Mut. Ins. Co. v. Futura Grp., L.L.C., No. 2:10cv324, 2011 U.S. Dist. LEXIS 45137, at *11 (E.D. Va. Apr. 21, 2011); Pa. Nat'l Mut. Cas. Ins. Co. v. Block Roofing Corp., No. 2:09cv312, 2010 U.S. Dist. LEXIS 132109, at *19 (E.D. Va. Dec. 14, 2010) (applying Virginia law and concluding that a duty to indemnify decision is only made "after the state court has made its decision"); Capitol Envtl. Servs., Inc., 536 F. Supp. 2d at 645 (applying Virginia law and explaining that a duty to indemnify determination is made based on facts actually discovered or proven at an underlying trial); see also Perdue Farms, Inc. v. Nat'l Union Fire Ins. Co., No. 04-1176, 2005 U.S. App. LEXIS 10136, *16-23 (4th Cir. 2005) (applying Florida law and looking to jury verdict and trial transcript in determining litigated facts to apply to policy language). After analyzing those state court findings, the court considering the duty to indemnify question must apply the applicable jurisdiction's duty to indemnify law and reach a

24

conclusion on whether an obligation to indemnify exists.   With
these principles of Virginia insurance law in mind, the Court
must briefly discuss general principles of Virginia insurance
contract interpretation.

## 2. General Principles of Virginia Insurance Contract Interpretation

Before conducting the duty to defend analysis and comparing
the allegations in the four corners of the underlying complaint
to the policy language, the Court must determine the meaning of
the policy language.  "Courts interpret insurance policies, like
other contracts, in accordance with the intention of the parties
gleaned from the words they have used in the document."  Seals
v. Erie Ins. Exch., 277 Va. 558, 562 (2009) (quoting Floyd v. N.
Neck Ins. Co., 245 Va. 153, 158 (1993)).   Therefore, "a court
must adhere to the terms of a contract of insurance as written,
if they are plain and clear and not in violation of law or
inconsistent with public policy."  Blue Cross & Blue Shield v.
Keller, 248 Va. 618, 626 (1994).  The Virginia courts "interpret
the unambiguous terms of a contract according to their plain
meaning."  Uniwest Constr., Inc. v. Amtech Elevator Servs., 280
Va. 428, 444 (2010).   It is not the function of the Court to
"'make a new contract for the parties different from that
plainly intended and thus create a liability not assumed by the

insurer.'" Keller, 248 Va. at 626 (quoting Pilot Life Ins. Co. v. Crosswhite, 206 Va. 558, 561 (1965)).

However, "[b]ecause insurance companies typically draft their policies without the input of the insured, the companies bear the burden of making their contracts clear." Res. Bankshares Corp., 407 F.3d at 636. "Accordingly, if a[] [patent] ambiguity[7] exists, it must be construed against the insurer." Id. "Where two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be construed most strongly against the insurer." Seals, 277 Va. at 562 (quoting St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co., Inc., 227 Va. 407, 411 (1984)). "[D]oubtful, ambiguous

---

[7] The Court notes that ambiguity can be found in two different forms - patent ambiguity and latent ambiguity. See SunTrust Mortg., Inc. v. AIG United Guar. Corp., No. 3:09cv529, 2011 U.S. Dist. LEXIS 45105, at *18 (E.D. Va. Apr. 26, 2011) ("Virginia courts have consistently distinguished between patent ambiguity—ambiguity apparent on the face of the instrument itself—and latent ambiguity—ambiguity that manifests only upon consideration of extrinsic evidence."). If a patent ambiguity exists (i.e., a contract with a price written "$200 (two hundred forty-five)"), the language will be construed most strongly against the insurer. If a latent ambiguity exists (i.e., a will devising something to "my nephew John" when decedent had two nephews named John), a court may look to parol evidence in an effort to determine the meaning of the language. Id. at *18-20 (citing S. Ins. Co. of Va. v. Williams, 263 Va. 565, 570 (2002)) ("It is well established that insurance contracts, like other contracts, generally are to be construed according to their terms and without reference to parol evidence. However, resort to parol evidence is proper where a latent ambiguity exists in a particular insurance contract.").

26

language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it." Granite State Ins. Co. v. Bottoms, 243 Va. 228, 234 (1992) (quoting Am. Reliance Ins. Co. v. Mitchell, 238 Va. 543, 547 (1989)).

When examining a patent ambiguity, where the language is to be construed against an insurer, such "[a]n ambiguity, if one exists, must be found on the face of the policy." Id. "[L]anguage is ambiguous when it may be understood in more than one way or when it refers to two or more things at the same time." Id. "As with other contracts, when interpreting a policy courts must not strain to find ambiguities." Res. Bankshares Corp., 407 F.3d at 636. "[C]ontractual provisions are not ambiguous merely because the parties disagree about their meaning." Nextel WIP Lease Corp. v. Saunders, 276 Va. 509, 516 (2008) (citing Dominion Sav. Bank, FSB v. Costello, 257 Va. 413, 416 (1999)).

When ultimately determining whether coverage exists, courts impose separate burdens on each party. "A policyholder bears the burden of proving that the policyholder's conduct is covered by the policy." Res. Bankshares Corp., 407 F.3d at 636. However, if the policyholder carries that burden, "the insurer bears the burden of proving that an exclusion applies." Bohreer, 475 F. Supp. 2d at 585. Cognizant of these principles

27

of law, the Court will address the motion for summary judgment below.

### III. Discussion

#### A. The Scope of Nationwide's Motion

Edmonds has filed a motion to strike Nationwide's motion for summary judgment on the ground that the motion is outside of the permissible scope discussed in the October 25, 2010 status conference and the Court's subsequent November 1, 2010 Order. Additionally, Overlook states in its Rule 56(f) declaration that the Court should not consider any issues that require a resolution of factual questions since the parties have not had sufficient time to engage in factual discovery. According to arguments made by both Edmonds and Overlook in writing and at oral argument, Nationwide's motion for summary judgment was to be limited to solely legal issues. As a result, Edmonds and Overlook contend that, at this juncture, the Court can properly address Nationwide's duty to defend Overlook with respect to the Edmonds lawsuit, since the resolution of that issue does not require the Court to make factual determinations and thus the Court's finding would not be affected by the previous discovery stay. However, they urge the Court not to address Nationwide's duty to indemnify Overlook with respect to the other twelve remediated units because any decision on that issue requires the

Court to make factual determinations requiring additional discovery and the presentation of litigated facts.

As the Court stated during oral argument, and memorializes in this Opinion and Order, because Nationwide's motion for summary judgment was to be limited to only legal issues, this Opinion and Order will only address Nationwide's duties with respect to Edmonds' claims - which can be resolved under the Eight Corners Rule. Although the Court recognizes that a motion to strike is an improper procedural tool for striking another motion,[8] and therefore the Court declines to grant Edmonds' motion to strike, the Court has discretion to limit the reach of Nationwide's motion for summary judgment under the Court's inherent power to manage its docket and discovery. See, e.g.,

---

[8] Under the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f) (emphasis added). The Court may do this on its own accord, or after a timely motion filed by a party. Id. According to Rule 7, a document is a pleading only if it fits in one of the following categories: complaint; answer to complaint; answer to a counterclaim; answer to a crossclaim; a third-party complaint; answer to a third party complaint; and a reply to an answer. Fed. R. Civ. P. 7(a). Therefore, a "motion is not a pleading." Structural Concrete Prods., LLC v. Clarendon Am. Ins. Co., No. 3:07cv253, 2007 U.S. Dist. LEXIS 54641, at *7 (E.D. Va. July 27, 2007). As a result, the Court recognizes that "'it is not proper under Fed. R. Civ. P. 12(f) to make a motion to strike a motion.'" Id. (quoting 61A Am. Jur. 2d Pleading § 507 (2007)). See Crosky v. Ohio Dep't of Rehab & Corr., No. 2:09cv0400, 2010 U.S. Dist. LEXIS 48465, at *5 (D. Ohio Apr. 20, 2010) ("It is clear under the Federal Rules of Civil Procedure, motions are not pleadings, and therefore are not subject to motions to strike under Rule 12(f).") (citations omitted).

Ingle v. Yelton, 264 F. App'x 336, 338 (4th Cir. 2008) ("[T]he scope and conduct of discovery lie within the sound discretion of the district court.") (unpublished).

Although the Court has limited the reach of Nationwide's motion for summary judgment, the issues that the Court will address cannot be dealt with summarily. The parties have raised a substantial number of arguments and the Court must analyze Nationwide's insurance obligations to Overlook vis-à-vis Edmonds' claims. Those issues are discussed below.

## B. Duty To Defend Overlook on the Edmonds Claims

### 1. Edmonds Lawsuit in the City of Norfolk Circuit Court

Nationwide argues that the Pollution Exclusion above is unambiguous and excludes coverage for Edmonds' suit. However, Overlook and Edmonds argue that the Pollution Exclusion is ambiguous, meaning reasonable minds could differ on whether Edmonds' allegations trigger the exclusion, and as a result, the language should be construed against the insurer.[9]

As mentioned previously, "[a] policyholder bears the burden of proving that the policyholder's conduct is covered by the policy." Res. Bankshares Corp., 407 F.3d at 636. However, "the insurer bears the burden of proving that an exclusion applies."

---

[9] Though the distinction is not made in the briefs, the argument made by Overlook and Edmonds is a patent ambiguity argument because they essentially claim that the language of the policies on their face, is ambiguous, i.e., the reference to "pollutants" can on its face, be read to mean two different things.

_Bohreer_, 475 F. Supp. 2d at 585.   In this case, however, since Nationwide's motion for summary judgment was specifically limited to the subject of the Pollution Exclusion, the Court need not address the initial question of whether the defective drywall claims are covered within the standard policy provisions.   The Court must only address, assuming the policy would ordinarily cover such claims, whether the Pollution Exclusion applies to exclude coverage.   As such, the burden is on the insurer – Nationwide – to show that the exclusion is applicable.

The question of whether the exclusion applies is addressed under the Eight Corners Rule.   According to that rule, the district court "need only decide such coverage by comparing what [the state court Plaintiff] _has alleged_ in the state court action with the language of the [provider's] insurance policy." _Penn-America Ins. Co._, 368 F.3d at 413.   If, when examining the insurance policy, the Court determines that the policy is "plain and clear and not in violation of law or inconsistent with public policy," the court "must adhere to the terms of a contract of insurance as written."   _Keller_, 248 Va. at 626. However, if the court determines that the exclusion is patently ambiguous and "two constructions are equally possible, that most favorable to the insured will be adopted. Language in a policy purporting to exclude certain events from coverage will be

construed most strongly against the insurer." Seals, 277 Va. at

562 (quoting St. Paul Fire & Marine Ins., 227 Va. at 411.

Consequently, the Court's determination of the Pollution

Exclusion issue must begin by discussing the allegations in

Edmonds' suit.

Edmonds alleges that the drywall used in his home "is
inherently defective because it emits various sulfide gases
and/or other toxic chemicals through 'off-gassing' that create
noxious odors, and cause damage and corrosion...to the
structural, mechanical and plumbing systems of the Plaintiff's
home...." (Colinvaux Aff. Ex. 16, at ¶ 11). Further, the
"compounds emitted by the drywall at issue are also capable of,
among other things, harming the health of individuals subjected
to prolonged exposure." Id. at ¶ 12. The "chemical compounds
cause and have caused dangerous health consequences including,
among other things, allergic reactions, respiratory afflictions,
sinus and bronchial problems requiring medical attention,
including headaches suffered by the Plaintiff." Id.
Additionally, as to health consequences, the complaint alleges
that "some of the compounds being emitted from Defendants'
defective drywall are very hazardous, some latently affecting
the central nervous system and basic oxygenation on a cellular
level." Id. at ¶ 58.

32

With these allegations in mind, the Court must compare the allegations in Edmonds' complaint to the language of the Pollution Exclusion in the relevant policies, and determine if the allegations in the complaint unambiguously fall within the reach of the Pollution Exclusion. If the allegations are within the exclusion, with no allegations in Edmonds' complaint falling outside the exclusion, Nationwide has no duty to defend Overlook with respect to Edmonds' underlying lawsuit. Further, if there is no duty to defend, there can be no duty to indemnify with respect to the claims in Edmonds' lawsuit because the duty of indemnification applies in a narrower set of circumstances than the duty to defend. See Penn-America Ins. Co., 368 F.3d at 413 ("Although an insurer's duty to indemnify will depend on resolution of facts alleged in the complaint, no such factfinding is necessary if there is no duty to defend because the allegations, even when taken as proved, would fall outside the policy's coverage."). The Court begins its analysis where the language of the Pollution Exclusion begins, with the question of whether Edmonds has alleged "bodily injury" or "property damage."

### a. Bodily Injury or Property Damage

According to the Liability Insurance and Excess Liability Coverages, the insurance does not apply to "bodily injury" or "property damage" arising out of pollutants. Therefore, before

addressing the issue of whether Edmonds' allegations refer to "pollutants," the Court must determine whether the injuries complained of by Edmonds are "bodily injury" or "property damage." In Edmonds' suit, he asserts twelve claims. In each of these claims, Edmonds concludes the count with a statement such as "[a]s a direct consequence of the material breaches...Plaintiff have [sic] sustained substantial damages set forth herein," (Colinvaux Aff. Ex. 16, at ¶ 20), "Plaintiff has incurred economic and other damages set forth herein," id. ¶ 68, or "Plaintiff has suffered damages set forth herein." id. ¶ 75. Therefore, the Court must look to the damages section of the state court complaint to determine the types of damages Edmonds has allegedly suffered.

In the damages section, Edmonds describes in detail the damages to which he is referring. This section states that "Plaintiff has suffered damage because their home contains inherently defective drywall that has caused damage to their home, Other Property, and their health." Id. at ¶ 90 (emphasis added). This damage includes, but is not limited to, repair or replacement of their family home, other property, materials contaminated or corroded by the drywall as a result of "off-gassing," costs of medical care, costs of relocation during repairs, storage costs, and other incidental and consequential damages. Id. at ¶ 91. Additionally, Edmonds seeks

34

environmental monitoring, medical care, and monitoring.   <u>Id.</u> ¶ 92.

These damages of which Edmonds complains all entail "bodily injury" or "property damage" – two terms that are unambiguous in this context.   It matters not that Edmonds' claims sound in legal theories that do not all specifically mention bodily injury or property damage since it is clear that bodily injury and property damage are precisely the injuries underlying each one of Edmonds' claims.   <u>See</u> <u>Nat'l Elec. Mfrs. Ass'n v. Gulf Underwriters Ins. Co.</u>, 162 F.3d 821, 825 (4th Cir. 1998) ("Every action involving bodily injury or property damage must assert some theory of liability but the theory chosen has no impact on the cause of the injury.").   Therefore, the allegations in the Edmonds complaint fall within the first portion of the Pollution Exclusion.   However, the Court must also consider whether the bodily injury or property damage arose out of actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants.

### b. Discharge, Dispersal, Seepage, Migration, Release or Escape

While the Court will consider whether emissions from defective drywall constitute "pollutants" in the following section, this section addresses the issue of discharge, dispersal, seepage, migration, release or escape.   Overlook argues that Nationwide has failed to show that any "pollutants"

traveled in such a manner.   As discussed above, Nationwide need not produce such evidence with respect to the duty to defend. The Court need only look at Edmonds' claim to determine if allegations made therein allege such a movement of the alleged sulfide gases.

"Because the words 'discharge,' 'dispersal,' 'seepage,' 'migration,' 'release,' or 'escape,' are not defined in the Policy, they must be given their usual, common, and ordinary meaning."   Firemen's Ins. Co., 474 F. Supp. 2d at 798 (citing D.C. McClain, Inc. v. Arlington Cnty., 249 Va. 131, 135 (1995)) ("Words that the parties used are normally given their usual, ordinary, and popular meaning.").   To determine the common and ordinary meaning, the Court looks to a reputable dictionary and considers a term's common usage.   See Centennial Broad., LLC v. Burns, Case No. 6:06cv00006, 2006 U.S. Dist. LEXIS 70974, at *34 (W.D. Va. Sept. 29, 2006) ("Its ordinary and plain meaning can be gleaned by resort to dictionary definitions and common usage.").   While all the terms above may not be applicable to the present case, the following definitions are relevant.   The dictionary defines "disperse" as "to spread or distribute from a fixed or constant source," "release" as "to set free from restraint, confinement, or servitude," and "escape" as "to issue from confinement <gas is escaping>."   See Merriam-Webster Online Dictionary (2011).

When applying the above definitions to the allegations in Edmonds' lawsuit, it is clear that Edmonds has alleged movement on the part of the sulfide gases that fall within the scope of the Pollution Exclusion. Edmonds' complaint states that the inherently defective drywall "emits various sulfide gases and/or other toxic chemicals through 'off-gassing.'" (Colinvaux Aff. Ex. 16, at ¶ 11). While the term "emit" is not used in the Pollution Exclusion, the dictionary definition of the term defines it as "throw[ing] or giv[ing] off," as in "chimneys *emitting* thick, black smoke." See Merriam-Webster Online Dictionary (2011). If a chimney emits thick, black smoke, it can be said that the smoke is "spread[ing]...from a fixed...source" – which is the dictionary definition of disperse. Moreover, the dictionary lists "discharge" and "release," both words used in the Pollution Exclusion, as synonyms for the term "emit." See Merriam-Webster Online Dictionary (2011). As a result, Edmonds' allegations in his complaint regarding the movement of the sulfide gases satisfy the discharge, dispersal, seepage, migration, release or escape requirement of the Pollution Exclusion.[10]   However, the Court

---

[10] During oral argument, counsel for Edmonds argued that subsequent scientific research suggests that harmful substances are not actually released from the drywall, but rather substances released from the drywall only become harmful when mixed with other substances in the air. Hearing Tr., 56, Mar. 8, 2011. As a result, Edmonds argues that even if the gases

must still address whether those sulfide gases can be classified as pollutants.

### c. Pollutants

As mentioned above, despite minor wording variations, the relevant policies all define "pollutants" as "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." (Sjullie Aff. Ex. 8).   Therefore, in order for a substance to qualify as a pollutant it must be both: (1) solid, liquid, gaseous, or thermal; and an (2) irritant or contaminant.

As to the first element of the definition, it is clear that Edmonds has alleged that the substance affecting his house is "gaseous."   His complaint specifically states that the drywall is "inherently defective because it emits various sulfide gases and/or other toxic chemicals through 'off-gassing.'" (Colinvaux

---

emitted by the drywall move in a manner contemplated by the Pollution Exclusion, at the point they are emitted, they are not yet pollutants because they have not yet become harmful.   While the Court expresses no opinion on whether damage caused by the drywall under Edmonds' new theory would fall within the ambit of the Pollution Exclusion, Edmonds cannot argue this new theory at this stage because such a theory is outside the bounds of his complaint.   The only fair reading of Edmonds' complaint is that the gases released by the drywall are harmful.   The complaint states that the defective drywall "emits various sulfide gases and/or other toxic chemicals through "off-gassing" that create noxious odors, and cause damage and corrosion." (Colinvaux Aff. Ex. 16, at ¶ 11 (emphasis added)).   Under an Eight Corners analysis, the Court may only consider the factual allegations contained in the complaint. Since the complaint does not support Edmonds' re-categorization of those facts, the Court cannot consider those arguments.

Aff. Ex. 16, at ¶ 11 (emphasis added)).  Further, in the damages section of the complaint, Edmonds alleges that materials within his home have been contaminated because of "off-gassing."  Id. at ¶ 91.  In fact, the parties have not asserted that Edmonds alleges anywhere in his complaint harm caused by a substance not in a solid, liquid, or gaseous state.  As a result, the Court concludes that the sulfide gases complained of are gases within the first portion of the definition of pollutant.

### i. Irritant or Contaminant

The relevant insurance policies also require the harm-causing substance to be unambiguously classified as an irritant or contaminant.  Nationwide argues that the gases produced by the defective drywall are irritants and contaminants, based purely on the dictionary definition of the words.  Overlook and Edmonds disagree with Nationwide's classification.  According to Overlook and Edmonds, regardless of whether sulfide gases that cause property damage and bodily injury might otherwise be classified as irritants or contaminants, in the context of the present case, those gases cannot be unambiguously classified as pollutants.  They argue that the definition of pollutant is ambiguous for a myriad of reasons and consequently the Court must construe the exclusion against the insurer and in favor of coverage.  For the reasons set forth below, the Court concludes

that the allegations in Edmonds' complaint unambiguously fall within the ambit of the relevant Pollution Exclusions.

### (a). Traditional Environmental Pollution

The first argument pressed by Edmonds and Overlook asserts that the Pollution Exclusion was meant to exclude coverage for damage caused by traditional environmental pollution, not damage allegedly caused by drywall used in the construction of a home. Since this case does not present an instance of a traditional environmental pollutant, Overlook and Edmonds contend that the Pollution Exclusion does not apply to the present case.

"The word 'pollutant' has received a great deal of scrutiny by the courts" and has been the subject of intense litigation. Firemen's Ins. Co. 474 F. Supp. 2d at 789. According to the court in Firemen's Insurance Co., "[n]umerous courts have held that a pollution exclusion bars coverage for all injuries caused by the release of pollutants, even where the pollutant is dispersed into a confined or indoor area." Id. at 792 (collecting cases) (citation omitted). However, "other courts have held that the exclusion does not apply if the facts show that the discharge, dispersal, release or escape was a localized toxic accident occurring within the vicinity of the pollutant's intended use." Id. at 793 (collecting cases) (citation omitted).

40

While the court is cognizant of the positions of other courts in other jurisdictions, its principal task is to try "to determine how the highest state court would interpret the law," and in doing so, it "should not create or expand that State's public policy." Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999) (quoting Talkington v. Atria Reclamelucifers Fabrieken BV, 152 F.3d 254, 260 (4th Cir. 1998)). See St. Paul Fire & Marine Ins. Co. v. Jacobson, 48 F.3d 778, 783 (4th Cir. 1995) ("[T]he federal courts in diversity cases, whose function it is to ascertain and apply the law of a State as it exists, should not create or expand that State's public policy."). Therefore, the Court must first turn to the Supreme Court of Virginia to determine whether it has spoken on the issue.

In City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc., 271 Va. 574 (2006), the Supreme Court of Virginia was faced with a certified question, asking whether claims by women who alleged that they all suffered miscarriages resulting from exposure to "THMs" in the City of Chesapeake's water supply were precluded by the Pollution Exclusion in a relevant insurance policy. Id. at 576. The definition of "pollutants" in the relevant policy in that case was identical to the definition of "pollutants" in the present case. See id. at 577-78. There, the court determined that the Pollution Exclusion was applicable to THMs in the water supply and thus

41

coverage was precluded. Id. at 578. Although the facts in City of Chesapeake differed from those presently before this Court, the Supreme Court of Virginia did provide valuable guidance as to the proper legal analysis this Court should follow in analyzing whether gases, produced indoors, could be classified as pollutants. The court stated that it was unnecessary to evaluate how other jurisdictions had resolved similar contract disputes "because the law of this Commonwealth and the plain language of the insurance policy provide the answer to the certified question." Id. at 579.

As a result, this Court must look to the contract law of the Commonwealth. One of the basic tenets of Virginia contract law is that the courts, when interpreting a contract, "construe it as written and will not add terms the parties themselves did not include." Landmark HHH, LLC v. Gi Hwa Park, 277 Va. 50, 57 (2009) (citing TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C., 263 Va. 116, 119 (2002)). The Virginia courts "will not insert by construction, for the benefit of a party, a term not express in the contract." Landsdowne Dev. Co., L.L.C. v. Xerox Realty Corp., 257 Va. 392, 400 (1999). Cognizant of those statements of law, this Court is persuaded by the logic in Firemen's Insurance Co., where a court in this district was construing a similar Pollution Exclusion pursuant to Virginia law.

There, the court said that "[n]owhere in the Policy is there any reference to the word 'environment,' 'environmental,' 'industrial,' or any other limiting language suggesting the pollution exclusion is not equally applicable to both 'traditional' and indoor pollution scenarios." Firemen's Ins. Co., 474 F. Supp. 2d at 796. To construe such an exclusion as only applying to traditional environmental pollution "would require this Court to interject words into the writing contrary to the elemental rule that the function of the court is to construe the contract made by the parties, and not to reformulate a contract for them." Id. See TRAVCO Ins. Co., 715 F. Supp. 2d at 717 ("Under Virginia law, pollutant exclusions are not limited to 'traditional environmental pollution.'"); W. Am. Ins. Co. v. Johns Bros., Inc., 435 F. Supp. 2d 511, 517 (E.D. Va. 2006) (determining in the context of that case that heating oil is a pollutant within the Pollution Exclusion). As a result, the Court concludes that the word "pollutant," when used in this Pollution Exclusion, does not apply solely to traditional environmental pollution.

Although the Supreme Court of Virginia in City of Chesapeake limited its analysis to Virginia law, this Court also concludes that the precedent of the United States Court of Appeals for the Fourth Circuit, applying non-Virginia law, does not dictate a different result. The Fourth Circuit addressed

43

the question of whether Pollution Exclusions are limited to traditional environmental pollutants in two cases in 1998.    In National Electrical Manufacturers Ass'n, the court was faced with the question of whether a Pollution Exclusion barred coverage under District of Columbia law for welders who were exposed to welding fumes and suffered neurological injuries as a result.    162 F.3d at 823.    In that case, the definition of "pollutant" was similar to the one in the present case, but the Pollution    Exclusion    as    a    whole    was    arguably    broader. Specifically, the Pollution Exclusion stated that the exclusion is "effective    whether    or    not    the    pollution    was    sudden, accidental,    gradual,    intended,    expected    or    preventable    or whether or not any of You caused or contributed to the pollution."    Id. at 824.    In its analysis, the Fourth Circuit concluded    that    the    Pollution    Exclusion    was    "plain," "unambiguous," and not limited to "atmospheric or environmental pollution."    Id. at 825-26.

Similarly, in Assicurazioni Generali, S.p.A. v. Neil, 160 F.3d 997 (4th Cir. 1998), the Fourth Circuit once again declined to find a Pollution Exclusion ambiguous.    In that case, many hotel guests sued a partnership that owned the hotel when the guests suffered carbon monoxide poisoning inside the hotel.    Id. at 999.    Neil, a general partner in the partnership, turned to the hotel's insurer for coverage.    The insurer declined to cover

44

the incident, citing the Pollution Exclusion among other provisions.   Although the definition of pollutants in that policy was similar to the definition in the present case, the language of the Pollution Exclusion as a whole was significantly different.   For example, the policy stated that the insurance does not apply to "[t]he contamination of any environment by pollutants that are introduced at any time, anywhere, in any way."   Id.   Additionally, the policy defined the term environment broadly, including in the definition "any person, any manmade objects or feature...land, bodies of water...air and any other feature of the earth or its atmosphere, whether or not altered, developed or cultivated, including...any of the above, owned, controlled or occupied by the insured."   Id.   Given this broad language, the Fourth Circuit concluded that carbon monoxide inside a hotel "plainly falls within this policy definition of 'pollutant.'"   Id. at 1000.

While the Fourth Circuit concluded that the Pollution Exclusions in those policies were unambiguous and applied to non-traditional environmental harms, it reached the opposite conclusion in a recent unpublished opinion, NGM Insurance Co. v. Kuras, No. 10-1082, 2011 U.S. App. LEXIS 512 (4th Cir. Jan. 11, 2011) (unpublished).   In order to fully discuss that opinion, the Court must first review the district court opinion that the Kuras court affirmed.   In that case, NGM Insurance Co. v.

45

Carolina's Power Wash & Painting, LLC, No. 2:08-cv-3378-DCN, 2010 U.S. Dist. LEXIS 2362 (D.S.C. Jan. 12, 2010), the district court was faced with the question of whether, under South Carolina law, a Pollution Exclusion excluded from coverage injuries resulting from exposure to "paint fumes, vapor, dust, and or other residue" inside a post office. Id. at *4-5. The Pollution Exclusion at issue was identical to the exclusion presently before this Court.

In its analysis, the district court first noted the split of opinion nationwide on the question of whether Pollution Exclusions "bar coverage for incidents outside of traditional environmental pollution." Id. at *11. Second, the district court analyzed Fourth Circuit precedent. It distinguished National Electrical Manufacturers Ass'n and Assicurazioni from the case before it because it found the language in those exclusions to be more "sweeping" than the Pollution Exclusion with which it was dealing. Id. at *14-15. The court then turned to cases from other jurisdictions.

While it noted "that the split of opinions [nationwide] provides only an indication of ambiguity, not a conclusive determination," Id. at *18, the district court found that the court in Belt Painting Corp. v. TIG Insurance Co., 795 N.E.2d 15, 16 (N.Y. 2003), provided the "most common-sense-based approach to the issue." Id. at *18-19. In Belt, the court

46

concluded that the definition of pollutants, similar to the one in the present case, was so expansive that it contradicted the "common speech" understanding of the term and the reasonable expectations of a business person.  Id. at *19 (citing Belt Painting Corp., 795 N.E.2d at 20).  Moreover, the Belt court noted that terms such as discharge, dispersal and release are environmental terms of art and it cannot be said that they unambiguously apply to ordinary fumes drifting only a short distance from their area of intended use.  Id.  As a result, following the Belt opinion's logic, the district court in NGM concluded that the Pollution Exclusion was subject to more than one reasonable interpretation and was thus ambiguous under South Carolina law.  Id.

In its unpublished opinion, the Fourth Circuit affirmed the district court's decision, calling it "well reasoned."  See Kuras, 2011 U.S. App. LEXIS at *5.  In the Fourth Circuit's analysis, it first noted that the district court concluded that the exclusion was ambiguous because it was "subject to more than one reasonable interpretation."  Id. at *4.  As to how the district court reached this conclusion, the Fourth Circuit stated that, "[c]onsistent with South Carolina law, the district court considered, as evidence of the exclusion's ambiguity, the nationwide division of authority over whether the pollution exclusion applies only to traditional environmental damage."

47

Id.  While much of the district court's opinion rested on the "common-sense-based approach" taken by the New York court in Belt, NGM Ins. Co., 2010 U.S. Dist. LEXIS at *19, the Fourth Circuit was silent on this avenue of analysis in its opinion. Kuras, 2011 U.S. App. LEXIS at *4-5.

This Court expresses no opinion as to the reach of a Pollution Exclusion under South Carolina law.  However, there are several reasons why it is not clear to this Court that the district court's analysis in NGM is consistent with how the Supreme Court of Virginia would decide the issue under Virginia law.  First, despite all of the various avenues of analysis performed by the district court in NGM, the Fourth Circuit chose to highlight only one in its affirmance – the district court's survey of the division of authority on the issue nationwide. Kuras, 2011 U.S. App. LEXIS at *4.  The Supreme Court of Virginia, however, when prompted to engage in the same type of analysis, explicitly rejected such an approach. City of Chesapeake, 271 Va. at 579 ("[T]he parties asked the Court to examine how other jurisdictions have resolved similar insurance contract disputes. It is unnecessary to do so, however, because the law of this Commonwealth and the plain language of the insurance policy provide the answer to the certified question.").  Therefore, such an approach to determining

ambiguity is not as persuasive under Virginia law as the Fourth Circuit found it to be when applying the law of South Carolina.

Second, the court in <u>Belt</u>, followed by the district court in <u>NGM</u>, declined to credit the term "pollutants" with what it viewed as an overly broad meaning because such a definition would contradict the "'common speech' understanding of the relevant terms." <u>NGM Ins. Co.</u>, 2010 U.S. Dist. LEXIS at *19 (quoting <u>Belt Painting Corp.</u>, 795 N.E.2d at 20). However, when a word is defined in a contract analyzed under Virginia law, as "pollutant" is here, the courts look to the definition provided within the four corners of the contract, not the word's connotation in everyday parlance. <u>Palmer & Palmer Co., LLC v. Waterfront Marine Constr., Inc.</u>, 276 Va. 285, 290 (2008) ("A contractual term, <u>absent a definition in the contract</u>, is construed according to its usual, ordinary, and popular meaning.") (emphasis added). While the word "pollutant," when undefined, might have a particular use in common speech, the parties are free to agree on a modified definition to be used in the contract, as they have here. Under Virginia law, the Court is not free to find an ambiguity in a defined term solely because the definition chosen by the parties differs from what might otherwise be the commonly recognized definition of that term. Therefore, Virginia law militates against the reading adapted by <u>NGM</u> on this issue.

49

Third, the court in Belt narrowed the meaning of the term "pollutants" because it believed that a broad interpretation of the word would not comport with the "reasonable expectations of a business person." NGM Ins. Co., 2010 U.S. Dist. LEXIS at *19 (quoting Belt Painting Corp., 795 N.E.2d at 20). However, as the court in Firemen's Ins. Co. noted, "Virginia has never explicitly adopted the 'reasonable expectations' doctrine by which an insured's expectations as to the scope of coverage must be upheld, provided that such expectations are objectively reasonable." Firemen's Ins. Co., 474 F. Supp. 2d at 798. The Firemen's Insurance Co. court continued, "even if this Court were to find the doctrine applicable in this case, it would only be relevant to this Court's analysis so as to give meaning to ambiguous Policy provisions." Id. (citing Allison E. Butler, 22 Holmes' Appleman on Insurance 2d § 7.2 (Matthew Bender, Inc. 2003 and Cumm. Supp. 2006)) ("Where the court finds the exclusion to be ambiguous, it may resort to the doctrine of reasonable expectations as the basis for analysis and resolution of the dispute.") (emphasis added by the Kline court). Therefore, since Virginia courts do not interpret a contract based on the reasonable expectations of the parties, such analysis is of no force under Virginia law. See Jarrett v. Goldman, 67 Va. Cir. 361, 386 (City of Portsmouth May 31, 2005) (noting that "the objective theory of contract...controls in

Virginia"). However, even if the reasonable expectations doctrine was applicable in Virginia, it is only triggered if the Court finds the contract ambiguous — independent of the reasonable expectations of the parties. When the doctrine is used, it is used to <u>clarify</u> an ambiguity, not <u>create</u> one. As a result, the Court finds that portion of the <u>Belt</u> analysis inapplicable to the present case.

Lastly, the <u>Belt</u> court held that it "cannot be said that" the terms "discharge, dispersal, seepage, migration, release or escape" "unambiguously appl[y] to ordinary paint or solvent fumes that drifted a short distance from the area of the insured's intended use and allegedly caused inhalation injuries to a bystander." <u>NGM Ins. Co.</u>, 2010 U.S. Dist. LEXIS at *19 (quoting <u>Belt Painting Corp.</u>, 795 N.E.2d at 20). Above, this Court analyzed the application of those terms to the factual scenario alleged in the Edmonds complaint. It found those terms unambiguous, with no indication from their plain meaning that they are inapplicable to irritants or contaminants that only drift a short distance. As a result, the Court also finds this portion of the <u>Belt</u> analysis unpersuasive under Virginia law.

Consequently, while the Fourth Circuit's unpublished opinion noted that the district court's opinion in <u>NGM</u> was "well reasoned" under South Carolina law, for the reasons explained above, this Court determines that the analysis adopted by the

51

district court would not be persuasive to the highest court in Virginia.[11]  However, the Defendants assert an alternative ground on which they believe the Pollution Exclusion in the present case is ambiguous – reasonableness.

### (b). Reasonableness

The Defendants argue that the Pollution Exclusion should not apply in the present case because it is unreasonable. According to Overlook and Edmonds, in Virginia Farm Bureau Mutual Insurance Co. v. Williams, 278 Va. 75, 81 (2009), the Supreme Court of Virginia stated, for the first time, that language which limits insurance coverage must be "reasonable, clear, and unambiguous."  In Overlook's brief, it keys on the word "reasonable," and states that "[n]o reasonable person would

---

[11] The Court notes that there are two possible ways in which opinions from other jurisdictions may be used to inform a court's analysis on the issue of whether a Pollution Exclusion is ambiguous.  As to the first use, a court may generally look at the fact that courts in other jurisdictions have disagreed as to whether a particular clause is ambiguous, and this disagreement itself can then be taken as evidence that the exclusion must be ambiguous.  The district court in NGM Insurance Co. considered this method of analysis, but ultimately did not rest its conclusion on such thinking.  In City of Chesapeake, the Supreme Court of Virginia expressly rejected this first approach and therefore this Court, following Virginia law, refuses to consider that line of reasoning.  As to the second use, a Court may examine another jurisdiction's analysis of the issue, and conclude that such analysis provides the most logical framework for determining whether ambiguity exists. This appears to be the method utilized by the district court in NGM Insurance Co.  While, in the Court's view, such an approach is perfectly acceptable under Virginia law, the Court declines to adopt the reasoning in Belt for the reasons discussed above.

expect a 'pollution exclusion' to apply to harm caused by drywall installed in a home." (Overlook Mem. Opp'n Mot. Summ. J. 17). Therefore, Overlook contends that the only reasonable interpretation of the Pollution Exclusion must be that it only applies to traditional environmental pollution. Id.

Overlook's argument, however, fails for several reasons. First, the Court is hesitant to attribute a significant new feature of Virginia insurance law, namely, that the Court must conduct a "reasonableness" analysis when judging exclusionary language in insurance contracts, solely on the basis of an isolated word the Supreme Court of Virginia used in its statement of the rule. In Williams, the Supreme Court of Virginia considered whether an exclusion in an automobile insurance policy prohibited an insured party from combining multiple different coverages. Williams, 278 Va. at 78. In its statement of the rule regarding exclusions, the court stated, "when an insurer seeks to limit coverage under a policy, the insurer must use language that is reasonable, clear, and unambiguous." Id. at 81. However, in its discussion of the exclusion, the court only focused on the issue of whether the insurance policy was ambiguous, it did not conduct a foray into a substantive analysis of the reasonableness of the exclusion in general. Id. at 82-83. Moreover, the two cases the court cited to support the notion that there is a "reasonableness" component

53

to examining policy exclusions also do not employ a substantive reasonableness test.

In Williams, the Supreme Court of Virginia cited Lower Chesapeake Assocs. v. Valley Forge Ins. Co., 260 Va. 77 (2000) when using the word "reasonable." In that case's discussion of the rule regarding the interpretation of insurance exclusions, it did not discuss reasonableness. There, the Supreme Court of Virginia stated "[w]hen an insurer drafts policy language setting forth exclusions that limit coverage under a policy, the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions." Id. at 88. The opinion's only mention of reasonableness deals with whether the policy is subject to multiple reasonable interpretations, and is thus ambiguous. The court did not engage in a determination of whether it found the policy substantively reasonable.

The Williams court also cited Granite State. There, the court did state that "[r]easonable exclusions not in conflict with statute will be enforced, but it is incumbent upon the insurer to employ exclusionary language that is clear and unambiguous." Id. (quoting State Farm Mut. Ins. Co. v. Gandy, 238 Va. 257, 261 (1989). However, once again, in that court's analysis, the only mention of reasonableness deals with whether the clause could reasonably be construed in more than one way,

which is an inquiry regarding ambiguity, not a substantive test for reasonableness. Further, in Gandy, the case cited by the court in Granite State, the court did state that it "routinely has approved the use of reasonable policy provisions excluding certain risks from coverage." Gandy, 238 Va. at 261 (1989). However, the Gandy court later stated that the exclusion at issue "meets the test for clarity. Therefore, we hold it is reasonable, valid, and enforceable...." Id. (emphasis added). The Gandy court did not engage in a substantive test for reasonableness, but rather held that reasonableness is associated with the clarity or lack of ambiguity in an exclusion.

To travel even further down this "rabbit hole," in Nusbaum, 227 Va. at 412, the case cited by the court in Gandy for the premise that exclusionary language must be reasonable, the Supreme Court of Virginia stated,

> [t]hus, the question in this case is resolved by the mere fact that reasonable men, including experts on the subject of the real estate industry, may reach reasonable, but opposite, conclusions as to whether leasing is a part of property management. It was incumbent upon the insurer to employ exclusionary language clear enough to avoid any such ambiguity, if it wished to exclude coverage for errors committed in the course of leasing.

Id. Like the other cases cited above, the reach of the court's reasonableness analysis in Nusbaum was limited to whether a policy was ambiguous because it was subject to several

55

reasonable interpretations.   Therefore, a Virginia court does
not engage in a substantive analysis of whether it believes an
insurance exclusion is in fact reasonable.   In fact, such a test
would be contrary to established principles of Virginia contract
law.   See Keller, 248 Va. at 626 (quoting Pilot Life Ins. Co.,
206 Va. at 561.   ("[A] court must adhere to the terms of a
contract of insurance as written, if they are plain and clear
and not in violation of law or inconsistent with public policy.
It is not our function to 'make a new contract for the parties
different from that plainly intended and thus create a liability
not assumed by the insurer.'").   As a result, the Court declines
to impute to the Supreme Court of Virginia a desire to engage in
an analysis of the substantive reasonableness of each exclusion
in an insurance policy on such a tenuous basis.

Additionally, the Defendants do not point to any principles
by which this Court could guide itself in conducting such an
amorphous substantive reasonableness analysis, if such analysis
were required.   Nor does it point to any case where a Virginia
court has employed such a reasonableness test.   In support of
its contention that the Pollution Exclusion in the present case
is unreasonable, Overlook asserts that many courts around the
country have found that it can be reasonably read to apply to
only traditional or environmental pollution.   However, that
statement ignores the fact that many other courts have concluded

that it could also apply to situations not involving traditional environmental pollution.  See, e.g., TRAVCO Ins. Co., 715 F. Supp. 2d at 717 ("Under Virginia law, pollutant exclusions are not limited to 'traditional environmental pollution.'").  As a result, since this Court concludes that Virginia courts do not apply a substantive reasonableness test to insurance exclusions, it refrains from doing so here.

While the Court concludes that the Pollution Exclusion need not pass a substantive reasonableness test in order to be deemed unambiguous, the Defendants also argue that the definition of "pollutants" is overbroad and thus ambiguous.  The Court addresses this contention below.

### (c). Overbreadth

At oral argument, the Defendants argued that the term "pollutants," as defined in the insurance contracts, is so broad that a plain meaning application of the terms "irritants" and "contaminants" would lead to absurd results.  As a practical example, defense counsel noted that sulfur released from a sliced onion has the ability to irritate one's eyes; therefore, it would be a "pollutant" under the definition found in the relevant insurance contracts.  Hearing Tr., 56, Mar. 8, 2011. According to the Defendants, such an outcome would be an absurd result, and given this potential absurdity, the Pollution Exclusion is ambiguous.  In support of this argument, the

Defendants cite to Granite State for the proposition that an overbroad exclusion that can lead to absurd results is ambiguous.

In Granite State, the Supreme Court of Virginia was faced with the question of whether an exclusion in an insurance contract issued to a "home for adults" barred coverage for burns suffered by a resident in the bathtub or shower at the home. See Granite State, 243 Va. at 229-31. The home in this case had an insurance policy with an exclusion that stated "the insurance does not apply to bodily injury...due to...the rendering of or failure to render...any service or treatment conducive to health...." Id. at 232. By statute, a home for adults was defined as an establishment "operated or maintained for the maintenance or care" of adults, with "maintenance or care" defined as "'the protection, general supervision and oversight of the physical and mental well-being'" of certain individuals. Id. at 231 (quoting Va. Code Ann. § 63.1-172(B)).

While the insurance company contended that the bathing of an elderly resident was within the plain, unambiguous meaning of the phrase "rendering...service or treatment conducive to health," and that coverage was therefore barred, the Supreme Court of Virginia disagreed. Id. at 232-33. It held that the phrase "conducive to health" is ambiguous because the "language is so broad that it may be understood in more than one way."

Id. at 234. In this Court's view, the Supreme Court of Virginia reached this conclusion for two principal reasons. First, it stated that "one could reasonably argue that almost any condition or function of an adult home could be classified as 'conducive to health' of the residents and, hence, any injuries negligently caused there are excluded from coverage." Id. at 235. As a result, if the exclusion were applied literally it could potentially swallow the entirety of the insurance coverage. The court was not prepared to reach that result by imputing such a broad meaning to the phrase.

Second, during trial, counsel for the insurance company noted that the exclusion would not apply to an injury resulting from a hypothetical slip and fall on soapy water negligently left in the hallway. Id. The Supreme Court found this concession quizzical because it believed that keeping hallways free of water could also be classified as "conducive to health." Given the fact that the insurance company's own reading of the policy led to conflicting results, namely coverage being excluded for an injury occurring during one act that the court felt was conducive to health, but not another that was also conducive to health, the court was not prepared to pronounce the exclusion unambiguous.

The Court finds that there are significant differences between Granite State and the present case. As a result,

despite the fact that the Supreme Court of Virginia found the exclusion in Granite State to be ambiguous, there are several reasons why this Court is not persuaded that Granite State dictates the same result in the present case.  First, as mentioned above, in Granite State, one of the court's main concerns was that a broad interpretation of the exclusion would swallow a significant portion of the policy's intended coverage provisions.  Since such an interpretation raised significant issues regarding the intended reach of the exclusion, the court concluded that the exclusion could not be read so broadly.  In the present case, the parties have not made such an argument and there is no reason for the Court to conclude that a plain reading of the Pollution Exclusion would effectively nullify the remainder of the policies' coverage provisions.  Therefore, a reading of the Pollution Exclusion that results in it applying broadly is not as problematic as it was in Granite State.

Second, in Granite State, trial counsel effectively conceded that the language of the exclusion was unclear.  Counsel for the insurer believed that the exclusion would apply to certain activities that the court felt were "conducive to health," yet not apply to other activities that the court also believed to be "conducive to health."  As a result of this conflict, the court held that the exclusion was ambiguous.  In this case, to the contrary, there has been no such concession.

Nationwide understandably argues that the Pollution Exclusion is clear and applies broadly. Therefore, trial counsel has not created the conflict that existed in Granite State.

Lastly, even if the Granite State holding could be read for the proposition that broad exclusionary language that has the potential to lead to absurd results is inherently ambiguous, which proposition is not altogether clear, a finding that the language in the present Pollution Exclusion is ambiguous does not necessarily follow. In City of Chesapeake, the Supreme Court of Virginia evaluated a Pollution Exclusion that was nearly identical to the one currently before this Court and did not find it to be ambiguous. City of Chesapeake, 271 Va. at 579. The absurd results line of reasoning was equally available to the court in City of Chesapeake as it is here, and the court chose not to find ambiguity. In fact, the absurd results argument was presented to the court in the Appellant's brief. See Brief of Appellant-Petitioner in City of Chesapeake, 2005 VA S. Ct. Briefs LEXIS 3, at *28-29 (2005). Given the fact that the Supreme Court of Virginia declined to apply the absurd results argument to the Pollution Exclusion in City of Chesapeake, this Court is not inclined to apply it here.[12]

---

[12] One might argue that since City of Chesapeake dealt with traditional environmental pollutants, finding the exclusion applied in that case would not be an absurd result. However, the absurd results argument is not an argument based on the

Based on the reasons discussed above, the Court finds the Granite State holding regarding overbreadth inapplicable to the present case and the Pollution Exclusion is not ambiguous purely because the term "pollutants" is broadly defined. However, Edmonds also argues that even if the Exclusion is not found to be ambiguous due to overbreadth, the plain language of the exclusion itself creates an ambiguity that must be construed against Nationwide.

### (d). Gases, Fumes or Vapors Exception

In Edmonds' motion for summary judgment, he asserts an alternative reason as to why the Pollution Exclusion in the present case should not free Nationwide from a duty to defend Overlook in the underlying state action. While Nationwide argues that subparagraph (a) of the Pollution Exclusion excludes coverage, Edmonds argues that subparagraph (d) of the exclusion either provides coverage or creates an ambiguity as to the meaning of the term "pollutants."

---

facts before the Court - it is an argument based on hypothetical facts. For example, as mentioned above, counsel for Edmonds used the example of cutting an onion to show that fumes from an onion could also be classified as a pollutant under the policy. According to counsel, such an outcome would be absurd and thus the policy must be ambiguous. As a result, even though City of Chesapeake dealt with traditional environmental pollutants and this case does not, the absurd results argument has equal applicability in both cases. Thus, the fact that the Court in City of Chesapeake did not invoke such reasoning to find the exclusion ambiguous is informative in this case as well.

Subparagraph (a) of the Pollution Exclusion excludes from coverage injury or damage caused by pollutants occurring "[a]t or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured."[13] (Sjullie Aff. Ex. 8). Subparagraph (d), on the other hand, provides a completely independent basis for excluding coverage. It excludes from coverage, property damage or injury caused by pollutants:

> d) At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any insured's behalf are performing operations if the "pollutants" are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor.

Id. However, the policy states that subparagraph (d) does not apply to:

> (ii) "Bodily injury" or "property damage" sustained within a building and caused by the release of gases, fumes or vapors from materials brought into that building in connection with operations being performed by you or on your behalf by a contractor or subcontractor....

---

[13] Subparagraph (a) of the Pollution Exclusion applies if the premises, site or location where the pollutant is found was at one time owned by an insured. In his Norfolk Circuit Court Complaint, Edmonds describes Overlook as a "builder/developer" of his home. (Colinvaux Aff. Ex. 16, at ¶ 1). Edmonds also alleged that the builder/developer warranted the home, id. at ¶ 22, and demanded that defendants "repurchase" the home. Id. at ¶ 57. Nationwide has also presented evidence accompanying its motion that indicates that Overlook owned Edmonds' unit prior to and during its construction before it was eventually sold to him. (See generally Colinvaux Aff. Ex. 1). The Defendants have not disputed this point.

Id. Edmonds' argument with respect to the exception to subparagraph (d) has two prongs. First, Edmonds contends that the exception to subparagraph (d) explicitly provides coverage for injuries or damage sustained as a result of the release of fumes, vapors or gases within a building. Second, in the alternative, Edmonds argues that the exception to subparagraph (d) creates an ambiguity as to whether gases, fumes or vapors inside a building amount to pollutants. These arguments, however, are unavailing.

As to the first argument, the exception to subparagraph (d) does not provide any coverage. It merely illustrates a scenario where coverage under subparagraph (d) is not excluded. If the Court concludes that coverage is excluded under subparagraph (a), then subparagraph (d) has no bearing on coverage. It does not "trump" the exclusion of coverage found in subparagraph (a) and give back coverage that subparagraph (a) previously excluded. The exception to subparagraph (d) only has a bearing on subparagraph (d)'s applicability – it is without force with respect to subparagraph (a). As Nationwide notes, when exclusions in a policy are disjunctive, only one exclusion need apply to bar coverage. See Mt. Hawley Ins. Co. v. Dania Distrib. Ctr., Case No. 09-61275-Civ-COOKE/BANDSTRA, 2011 U.S. Dist. LEXIS 9007, at *16 (S.D. Fla. Jan. 31, 2011) ("[T]he

pollution exclusion clause contains four disjunctive subsections, meaning that the exclusion applies if any one of the four conditions is met."). If the Court concludes that coverage is excluded under subparagraph (a) of the Pollution Exclusion, the exception to subparagraph (d) does not restore that coverage. See Travelers Indem. Co. of Am. v. Miller Bldg. Corp., 142 F. App'x 147, 150 (4th Cir. 2005) (unpublished) ("[A]n exception to an exclusion does not grant or extend coverage....").

In the alternative, Edmonds argues that the exception to subparagraph (d) creates an ambiguity as to the meaning of the term "pollutants." According to his brief, Edmonds contends that subparagraph (d) establishes "that there is clearly a distinction between the events involving gases, fumes or vapors occurring inside of the buildings as opposed to a traditional environmental event." (Edmonds Mem. Supp. Mot. Summ. J 8). Therefore, Edmonds surmises the introduction of this "gases, fumes or vapors" exception in subparagraph (d) is evidence that "pollutants" was not intended to cover substances outside the scope of traditional environmental pollutants, and thus the exclusion should not apply in the present case. That argument, however, is unavailing for at least two reasons.

First, the presence of the exception indicates that the parties were clearly capable of limiting the effect of the

Pollution Exclusion if they intended to do so. However, subparagraph (a) of the Pollution Exclusion, which has three exceptions of its own, does not contain an analogous exception to the one in subparagraph (d). In fact, two of the exceptions to subparagraph (a) deal with smoke and fumes, yet none of them discuss such substances coming from "materials brought into that building." The absence of such an exception in subparagraph (a) indicates that the exception to subparagraph (d) was not meant to effect or modify the exclusion in subparagraph (a). Second, the fact that the contract excepts from the Pollution Exclusion, in certain instances, "gases, fumes or vapors from materials brought into the building," could also militate in favor of the position that such substances are considered pollutants under the policies' definition. It can be argued that, if they were not pollutants, there would be no need to except them. As a result, the exception does not create ambiguity as to whether the Pollution Exclusion only applies to traditional environmental pollutants.

### (e). Irritants and Contaminants Revisited

Since the Court concluded above that the Defendants' arguments regarding the reach of the Pollution Exclusion are unavailing, the Court must simply apply the plain language of the Pollution Exclusion to the allegations in Edmonds' complaint to determine if coverage is excluded. The Court has already

66

determined that Edmonds has alleged only "bodily injury" or "property damage" and that the harmful gases are alleged to have moved in a way contemplated by the exclusion.   Therefore, the Court is only left with the question of whether the gases are irritants or contaminants.   Because the words "irritant" and "contaminant" are not defined under the applicable insurance policies, the Court must attribute to them their ordinary meaning.   See D.C. McClain, Inc., 249 Va. at 135 ("Words that the parties used are normally given their usual, ordinary, and popular meaning.").   "Irritant" is defined as "causing irritation," and "irritate," in turn, is a verb meaning "to provoke impatience, anger, or displeasure."   See Merriam-Webster Online Dictionary (2011).   Similarly, "contaminant" is defined as "something that contaminates," with "contaminate," in turn, defined as "to soil, stain, corrupt, or infect by contact or association" or "to make unfit for use by the introduction of unwholesome or undesirable elements."   See Merriam-Webster Online Dictionary (2011).

Edmonds' state court complaint alleges that the drywall "emits various sulfide gases and/or other toxic chemicals through 'off-gassing' that creates noxious odors, and cause damage and corrosion...to the structural, mechanical and plumbing systems of the Plaintiff's home." (Colinvaux Aff. Ex. 16, at ¶ 11).   Further, according to Edmonds' complaint, this

damage necessitates a repair or replacement of various parts of his home as well as medical care and monitoring. Id. at ¶¶ 91, 92. These allegations place the sulfide gases squarely within the categories of irritants and contaminants. Certainly a gas that produces noxious odors and necessitates medical care and monitoring is one that "provokes displeasure." Moreover, a gas that allegedly damages components of one's home can also be said to have made those components "unfit for use by the introduction of unwholesome or undesirable elements." As a result, when the Court looks just to the dictionary definition of the terms "irritant: and "contaminant," and applies those definitions to the allegations in the Edmonds complaint, the Court concludes that the sulfide gases alleged in the Edmonds complaint unambiguously qualify as irritants or contaminants under the Pollution Exclusion.

This conclusion is consistent with decisions of other federal courts deciding the reach of the Pollution Exclusion under Virginia law. See Firemen's Ins. Co., 474 F. Supp. 2d at 791 (holding that fumes emanating from an epoxy sealant applied to a concrete floor are "pollutants"); TRAVCO Ins. Co., 715 F. Supp. 2d 699, 718 (E.D. Va. June 3, 2010) ("Under any reasonable definition of these terms, the gases released into the Ward Residence [from defective drywall] qualify as irritants and contaminants."). Consequently, since the sulfide gases are both

(1) gaseous and (2) irritants or contaminants, they qualify as pollutants.  However, the conclusion that the emissions from the drywall are pollutants does not end the Court's duty to defend analysis.

### d. Allegations in the Complaint not implicating Pollutants

Regardless of the Court's determination that the Pollution Exclusion is unambiguous and applicable to gases Edmonds alleges were emitted from defective drywall, the Defendants argue that even if some of the allegations in Edmonds' lawsuit fall within the Pollution Exclusion, other allegations fall outside of it and thus Nationwide has a duty to defend.  Since the law in Virginia requires that "[w]hen an initial pleading 'alleges facts and circumstances, *some of which would, if proved*, fall within the risk covered by the policy,' the insurance company is obliged to defend its insured," Parker v. Hartford Fire Ins. Co., 222 Va. 33, 35 (1981) (emphasis added), the Defendants argue that Nationwide has a duty to defend Overlook because Edmonds might recover on legal theories outside of those that implicate the Pollution Exclusion.  In support of this argument, Overlook highlights several allegations in the underlying Edmonds lawsuit that do not make any mention of discharge, dispersal, seepage, migration, release, or escape of pollutants.

For example, Overlook points out that Count IV of Edmonds' state court complaint states that "Defendants owed a duty to the

Plaintiff to exercise reasonable care in distributing, delivering, supplying, inspecting, installation, marketing, and/or selling drywall, including a duty to adequately warn of its failure to do the same and to warn the Plaintiff of this Defect." (Colinvaux Aff. Ex. 16, at ¶ 33). According to Overlook, "[i]f Edmunds [sic] can prove those allegations, but does not prove that the mechanism suggested in other parts of his allegations is what actually caused the alleged problems, the resulting judgment could be covered no matter how one reads the exclusion or defines 'pollutant.'" (Overlook Mem. Opp'n Mot. Summ. J. 9).

In support of this contention, Overlook cites two principal cases, Parker and Fuisz. In Parker, the insurance policy issued to the Parkers obligated the insurance company to "defend any suit against the Insured alleging such bodily injury or property damage...[,]" but it did not apply to "bodily injury or property damage caused intentionally." Parker, 222 Va. at 34 (internal quotations omitted). During the policy's coverage period, Parker was sued for trespassing on a family burial ground, with the complaint alleging that Parker at one point "knew or should have known" that he was trespassing on the burial lot, and later, that he had "actual knowledge." Id. (internal quotations omitted). The trial court held that the exclusion applied and thus there was no duty to defend because the complaint alleged

70

"intentional trespass." Id. at 35. However, the Supreme Court of Virginia reversed, holding that "[w]hile some of the language of the pleadings is couched in terms of intentional trespass, the pleadings, without amendment, could have supported a judgment of unintentional trespass." Id. As a result, since Parker could have lost the lawsuit without a showing of "intentional trespass," there was still a duty to defend.

In Fuisz v. Selective Ins. Co. of Am., 61 F.3d 238 (4th Cir. 1995), the Fourth Circuit faced a more complex scenario than that presented in Parker. There, the insured was sued for defamation. Id. at 240. However, he had an insurance policy which, according to the court's interpretation, created a duty to defend the insured against defamation claims, *unless* the insured is found to have intentionally caused injury. Id. at 243. Therefore, under the Eight Corners Rule, the court had to determine if the complaint only permits recovery under a theory that the insured intended to cause harm, in which case there would be no duty to defend, or whether the complaint creates the possibility of recovery based on "reckless disregard for the falsity" of the defamatory statements, in which case there would be a duty to defend. Id. at 243-45. After a thorough analysis, the Fuisz court concluded that the complaint alleged both theories of culpability. Thus the duty to defend could not be eliminated because the complaint alleged some ground for

71

recovery that did not fall within the policy exclusion, even if the eventual ground upon which recovery was based would have implicated the exclusion.   See id.

The Court concludes that there is at least one significant distinction between Parker, Fuisz and the present case.   In both Parker and Fuisz, the underlying complaint made allegations that provided a ground for recovery that did not implicate the policy exclusions in those cases.   Since Virginia case law is very clear that "an insurer's duty to defend arises 'whenever the complaint against the insured alleges facts and circumstances, some of which, if proved, would fall within the risk covered by the policy,'" Penn-America Ins. Co., 368 F.3d at 413 (quoting Brenner, 240 Va. at 189)), the duty to defend in those cases was triggered.   The Edmonds lawsuit contains no such allegations.

The Edmonds suit states that the drywall is "inherently defective because it emits various sulfide gases and/or other toxic chemicals through 'off-gassing' that creates noxious odors, and cause damage and corrosion" – which the complaint classifies as the "Defect."   (Colinvaux Aff. Ex. 16, at ¶ 11).   Further, each of the first eleven counts of the complaint state that the "Plaintiff incorporates and restates all preceding paragraphs as if fully set forth herein."   See, e.g., id. at ¶ 16.   While the twelfth count does not include such language, it does directly reference the "Defect" in the drywall.   Id. at ¶

82.   Further, in the damages section of Edmonds' complaint, which is referenced in eleven of the twelve counts, Edmonds states that "Plaintiff has suffered damage because their home contains inherently defective drywall."   Id. at ¶ 90.   As to Count seven, which does not mention the damages portion of the complaint, it references the "conduct" of the Defendants, which refers to the installation of drywall with the "Defect."   Id. at ¶ 55.   As a result, every claim in the underlying Edmonds complaint implicates the defective drywall as either the basis for the claim, or the cause of the resulting damages.   Thus every claim implicates the Pollution Exclusion.

Although it is not argued in Overlook's brief, Count XI of the Edmonds lawsuit comes closest to providing a ground for recovery that does not implicate the Pollution Exclusion.   In Count XI, Edmonds states a claim under the Virginia Consumer Protection Act.   The Virginia Consumer Protection Act states:

> A.   The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:
>> 1) Misrepresenting goods or services as those of another;
>> 2) Misrepresenting the source, sponsorship, approval, or certification of goods or services;
>> 3) Misrepresenting the affiliation, connection, or association of the supplier, or of the goods or services, with another;
>> 4) Misrepresenting geographic origin in connection with goods or services;...

73

Va. Code. Ann. § 59.1-200.  In order to state a cause of action for a violation of this statute, "plaintiff must allege a fraudulent misrepresentation of fact." Weiss v. Cassidy Dev. Corp., 63 Va. Cir. 76, 78 (Fairfax Cnty. 2003).  Further, "[a]llegations of misrepresentation of fact must include the elements of fraud: a false representation, of material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage." Id.

Edmonds alleges that the Defendants violated the consumer protection act by, among other things, "[m]isrepresenting the source,...of goods or services;" "[m]isrepresenting the affiliation, connection or association of the supplier or of the goods or services, with another;" and "[m]isrepresenting geographic origin in connection with goods or services." (Colinvaux Aff. Ex. 16, at ¶¶ 80, 81).  These are all allegations regarding misrepresentations of fact that do not implicate the underlying defect found in the drywall.

However, under Virginia law, as a pre-requisite to bringing suit under this statute, Edmonds must show that he "suffer[ed] loss." Polk v. Crown Auto, Inc., 228 F.3d 541, 543 (4th Cir. 2000) (citing Va. Code Ann. § 59.1-204(A)).  As mentioned previously, every claim of damages pled in Edmonds' complaint can be traced to the defective nature of the drywall.  According to the complaint, the damages include repair or replacement of

74

their family home, other property and other contaminated
material resulting from "off-gassing." Additionally, Edmonds
seeks reimbursement for the costs of medical care, relocation,
storage costs, the loss of use and enjoyment of the property,
and the loss in value of the home due to the stigma attached to
having defective drywall in the home. Since each allegation of
damages in Edmonds' complaint requires that Edmonds show the
drywall is defective because it emits toxic chemicals, he has
not pled any damages that do not implicate the Pollution
Exclusion.

In applying the Eight Corners Rule, the Fourth Circuit has
recently counseled that "the potentiality rule does not require
us to abandon the rule of reason." CACI Int'l, Inc., 566 F.3d
at 159. In CACI International Inc., the court held that even
though there was a theoretical possibility that a set of facts
could require a duty to defend on the part of the insurer, that
"mere possibility does not rise to the level of potentiality."
Id. While, it is true, as Overlook contends, that each claim
does not specifically use terms such as discharge and dispersal,
each claim, and the damages sought, stem from the defective
nature of the drywall. Certainly, it may be conceivable that
Edmonds could succeed on some of the claims in the state court
action by proving the drywall is defective in a way that was not
pled in the state court complaint and thus does not implicate

75

the Pollution Exclusion. However, this Court need not
boundlessly hypothesize as to the other types of defects that
might be proven. The Eight Corners Rule instructs the Court to
look strictly at the underlying complaint. As a result, since
each claim pled in the complaint implicates the Pollution
Exclusion, there is no duty to defend in the Edmonds Norfolk
Circuit Court action.

### IV. Conclusion

For the reasons discussed above, the Court **GRANTS IN PART**
Nationwide's motion for summary judgment. Nationwide does not
have a duty to defend Overlook in Edmonds' lawsuit brought in
the Circuit Court for the City of Norfolk because coverage is
excluded under the relevant policies' Pollution Exclusion. As a
result, the Court **DENIES** the motions for summary judgment
brought by Overlook and Edmonds. However, given the prior
discovery stay and the lack of evidence on the subject of how
the damages *actually* occurred in the "Non-Edmonds" homes, the
Court exercises its discretion and **HOLDS ITS DECISION IN
ABEYANCE** on the subject of Nationwide's duty to indemnify
Overlook in regards to the other units until the Court
determines how it will proceed with the remainder of the case.
Additionally, since the indemnity issue with respect to the Non-
Edmonds units will be decided at a later date, the Court
**DECLINES TO DISMISS** Overlook's counterclaim regarding breach of

76

contract until the Court concludes whether or not Nationwide has actually breached a contractual duty. Lastly, concerning the pending motion to amend the Complaint, which asks that Nationwide be granted leave to add allegations to the Complaint regarding the Wiltz and Amato actions, the Court will address that motion in a separate Order.

The Clerk is **DIRECTED** to send a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 13 , 2011